Filed: December 30, 2011

IN THE SUPREME COURT OF THE STATE OF OREGON

URSULA WHITE,
BRUCE N. REITER,
and MARGARET RETZ,

Plaintiffs-Appellants,

v.

PUBLIC EMPLOYEES RETIREMENT BOARD,

Defendant-Respondent,

and

STATE OF OREGON,
LANE COUNTY, CITY OF EUGENE, MULTNOMAH COUNTY,
CITY OF PORTLAND, CITY OF ROSEBURG,
CITY OF HUNTINGTON, CANBY UTILITY BOARD,
and ROGUE VALLEY IRRIGATION.

Intervenors-Respondents.

(CC 040404118, 041111848; CA A142773; SC S059213)

On certified appeal from the Court of Appeals on appeal from a judgment of the Circuit Court for Multnomah County, Henry Kantor, Judge.

Argued and submitted May 3, 2011.

Gregory A. Hartman, Bennett, Hartman, Morris & Kaplan, LLP, Portland, argued the cause for plaintiffs-appellants. With him on the briefs were Michael J. Morris and Aruna A. Masih.

Joseph M. Malkin, *pro hac vice*, San Francisco, California, argued the cause for defendant-respondent Public Employees Retirement Board. With him on the briefs were Sarah Marriott and Townsend Hyatt.

William F. Gary, Harrang Long Gary Rudnick P.C., Eugene, argued the cause for intervenors-respondents Lane County, *et al*. With him on the briefs was Sharon A. Rudnick.

Jeremy D. Sacks, Stoel Rives LLP, Portland, filed a brief for intervenor-

1

respondent State of Oregon.  With him on the brief was Amy Edwards.

Before De Muniz, C. J., Durham, Balmer, Kistler, Walters, and Linder, JJ.*
BALMER, J.

The judgment of the circuit court is affirmed in part and reversed in part, and the case is remanded to the circuit court for further proceedings.

*Landau, J., did not participate in the consideration or decision of this case.

BALMER, J.

Plaintiffs, one retired member and two active members of the Public Employees Retirement System (PERS), challenge certain actions of the Public Employees Retirement Board (PERB), alleging that those actions violated PERB's fiduciary duty to manage PERS for the exclusive benefit of PERS members. Specifically, plaintiffs allege that PERB breached its fiduciary duty when it settled *City of Eugene v. State of Oregon*, Marion County Circuit Court No. 99C-12794 (and consolidated cases), on the terms that it did and when it implemented that settlement agreement and took related actions through a series of administrative orders, calculations, and allocations.

Respondent PERB and intervenors -- the State of Oregon and various public employers -- reply that PERB's settlement of the *City of Eugene* case was reasonable and consistent with PERB's statutory and common-law duties, as were the actions that PERB took pursuant to the settlement agreement.[1] They assert that PERB's other actions challenged by plaintiffs were required by the PERS Reform and Stabilization Act of 2003 or by court order and, in any event, were consistent with PERB's fiduciary obligations to PERS beneficiaries. The trial court entered judgment in favor of PERB and intervenors, and plaintiffs appealed. The Court of Appeals certified the appeal to this court, ORS 19.405. We agree in substantial part with the trial court's

_____

[1] Because the arguments of PERB and intervenors are generally aligned, we sometimes refer to them collectively as "defendants."

1

analysis and disposition, although we conclude that there are disputed factual issues with respect to one of plaintiffs' claims and that the trial court erred in granting summary judgment for defendants on that claim.  We therefore affirm in part, reverse in part, and remand to the trial court.

## I.  BACKGROUND

We begin by describing briefly the *City of Eugene* litigation and the agreement settling that case, the 2003 PERS legislation (as it relates to the issues here), and PERB's subsequent administrative actions.  We then return to the allegations in plaintiffs' complaint.

In *City of Eugene*, several public employers, including the City of Eugene, challenged PERB orders issued in 1998 and 2000 that increased the contribution rates that determine the amounts public employers must pay into PERS on behalf of employees who are PERS members.  *See City of Eugene v. PERB*, 339 Or 113, 117-18, 117 P3d 1001 (2005) (summarizing allegations in complaint).  Those employer contributions, along with employee contributions and investment earnings on those contributions, constitute the fund -- the Public Employees Retirement Fund (PERF or the fund) -- from which member pensions are paid.  The employers also challenged a PERB order that credited the regular accounts of PERS Tier One members -- members who joined PERS before 1996 -- with 20 percent earnings for the 1999 calendar year.  *Id*.  The employers argued that the contribution rate orders were unlawful because PERB, in violation of statutory requirements, had failed to fund a contingency reserve account and a "gain-loss" reserve account, had required employers to match the earnings in members' variable

2

accounts, and had failed to adopt updated actuarial factors. The employers also claimed that PERB abused its discretion when it made the crediting decision for the 1999 calendar year.

In 2001, Judge Lipscomb, the Marion County Circuit Court judge handling the *City of Eugene* case, granted the employers' motion for partial summary judgment, agreeing that PERB had not administered the fund consistently with statutory requirements and that it had abused its discretion in crediting Tier One accounts with 20 percent earnings for 1999. In response to an argument raised by eight PERS members who had intervened in *City of Eugene*, the trial court concluded that PERB also breached its fiduciary duty with respect to the 1999 earnings allocation order when it credited to employer accounts some of the income earned on funds in the variable account. The trial court vacated the challenged orders and remanded to PERB with instructions to issue new orders consistent with its rulings. *Id.* at 118-19. PERB appealed the trial court judgment. It also sought a stay of the judgment, first from the trial court and, later, from the Court of Appeals. Both requests were denied. *Id.* at 119-20. As one step towards complying with the *City of Eugene* judgment, PERS recalculated the crediting order for 1999 and determined that if PERB had properly funded the contingency and gain-loss reserve accounts, an appropriate credit to Tier One accounts would have been 11.33 percent, rather than the 20 percent that PERB had initially ordered.

Meanwhile, the legislature enacted the PERS Reform and Stabilization Act of 2003 and several other bills changing the operation of PERS. Among other things, the legislature restructured PERB itself and "effectively codif[ied]" the 11.33 percent figure

3

as the correct 1999 crediting decision.  *See Strunk v. PERB*, 338 Or 145, 216, 108 P3d 1058 (2005) (so describing 2003 legislation).

In February 2004, PERB entered into a settlement agreement with the *City of Eugene* plaintiffs by which "PERB agreed to issue, by July 1, 2004, new orders that would comply with both the trial court's judgment and the terms of the [PERS reform legislation]."  *City of Eugene*, 339 Or at 120.[2]  PERB also agreed to dismiss its appeal of the trial court judgment and to pay specified attorney fees to the plaintiffs.  Intervenors in the *City of Eugene* case did not agree to the settlement and opposed PERB's motion to dismiss the pending appeal of the trial court's judgment.  This court granted PERB's motion to dismiss, holding that, in light of the settlement agreement, the new PERB orders, and the legislative changes to PERB, the appeal was moot.  *City of Eugene*, 339 Or at 128.  Subsequently, this court entered an order vacating the trial court judgment that had been the subject of the appeal.  *City of Eugene v. PERB*, 341 Or 120, 137 P3d 1288 (2006).

## II.  THE PARTIES' CONTENTIONS

In this action, plaintiffs challenge the settlement of the *City of Eugene* litigation and the administrative actions taken in 2004 by PERB to implement that

---

[2]     PERB entered into a virtually identical settlement agreement with the Eugene Water and Electricity Board (EWEB), which had brought a similar but separate action against PERB.  For convenience, we refer only to the settlement agreement in the *City of Eugene* litigation. Our discussion of the issues, however, applies equally to plaintiffs' claims regarding the EWEB litigation and settlement agreement.

4

settlement. They seek judicial review of PERB's actions under the Administrative Procedures Act (APA) and, in the alternative, common-law remedies for PERB's alleged breach of fiduciary duty.[3] Specifically, plaintiffs challenge the following actions of PERB: (1) the dismissal of PERB's appeal of Judge Lipscomb's decision in the *City of Eugene* case; (2) the issuance of new employer contribution orders for 1998 and 2000; (3) the issuance of a new crediting decision for PERS accounts for 1999; (4) the transfer of $61 million from the contingency reserve to employer accounts based on PERB's recalculation of the 1998 and 2000 contribution orders; (5) the transfer of amounts credited to employer accounts for 1999 under the "employer in variable" rule to the contingency reserve; (6) the adoption of a new administrative rule for the calculation of the "money match" benefit for PERS members participating in the variable account program; and (7) the payment of attorney fees to the plaintiffs in *City of Eugene* and the similar case filed by the Eugene Water and Electricity Board (EWEB).

---

[3] Plaintiffs seek judicial review of PERB's actions -- including entering into the settlement agreement and issuing the orders discussed above -- as "orders other than contested cases." ORS 183.484(1). They also challenge the same actions under a common-law breach of fiduciary duty theory. As to plaintiffs' ORS 183.484(1) claim, defendants argued that the trial court lacked jurisdiction to review the decision to enter into the settlement agreement because that decision was not a "final order" for purposes of judicial review. (They recognized, however, that the trial court had jurisdiction to consider plaintiffs' claims under their alternative common-law fiduciary duty theory.) The trial court rejected defendants' jurisdictional argument and decided all the claims on the merits. For present purposes, we may assume, without deciding, that PERB's decision to enter the settlement agreement in *City of Eugene* was an "order" in other than a contested case and that the trial court had jurisdiction to review the decision under ORS 183.484(1).

Plaintiffs allege that those actions violated PERB's common-law fiduciary duties and its "statutory fiduciary duties and obligations." Plaintiffs argue that PERB's decision to settle was made without evaluating and weighing "the relatively small cost of proceeding with the Supreme Court appeal and the potentially enormous benefit to PERS members from the reversal of the trial court's decision." Plaintiffs assert that PERB's actions reduced member benefits by $1.6 billion; had no "discernible benefit" to PERS members, PERB, or the fund; and were outside the range of discretion delegated to PERS by applicable statutory and trust law. They seek to set aside the settlement agreement and the 2004 PERB orders that implemented the agreement.[4]

PERB and intervenors respond that PERB's actions were consistent with its statutory and common-law trust obligations. They assert that plaintiffs incorrectly view any action that does not maximize benefit payments to members as a breach of fiduciary duty and that PERB instead must administer PERS in accordance with statutes that set the terms of the PERS contract, including benefit levels -- and that PERB did so. They further argue that, in making decisions to settle or pursue litigation, and when exercising discretion in allocating funds to specific accounts, PERB may consider the stability and

---

[4] In their challenge under the APA, plaintiffs seek to set aside PERB's actions because PERB "erroneously interpreted a provision of law and * * * a correct interpretation compels a particular action." ORS 183.484(5)(a). In the alternative, plaintiffs assert that PERB's action breached its statutory and common-law fiduciary duties to plaintiffs and that those actions should be set aside under the court's equitable powers. Because the substantive issues are the same under either theory, we do not distinguish between plaintiffs' APA and common-law claims, except as specifically noted elsewhere in this opinion.

6

viability of the fund and the longer term interests of all PERS beneficiaries -- and not simply the employee accounts or future benefit levels for active PERS members.

III.  ANALYSIS

Before examining plaintiffs' challenges to specific PERB actions, we briefly review the PERS trust and PERB's general obligations to PERS members.[5]  The legislature established PERF as a "trust fund," with PERB as the "trustee."  ORS 238.660(1).[6]  *See also Strunk*, 338 Or at 157 (describing PERB as "trustee" and assets of PERF as held "in trust"); *Arken v. City of Portland*, 351 Or 113, 120, 263 P3d 975 (2011) (same).  Trusts are to be administered in accordance with the trust instrument, and trusts created by statute, like the trust that establishes the fund here, "are administered as express trusts, the terms of which are either set forth in statute or are supplied by the default rules of general trust law."  *Restatement (Third) of Trusts* § 4 comment g (2003). *See Arken*, 351 Or at 163 (so stating).  Although common-law trust principles generally apply to the administration of statutory trusts, such as PERS, the applicable statutory rules "often present fundamentally different considerations [than those involved in nonstatutory trusts], thus expressly or impliedly calling for application of different rules *

---

[5]     We have described the structure and operation of PERS and the 2003 legislation in detail in other decisions.  *See, e.g.*, *Strunk*, 338 Or at 157-66; *Arken v. City of Portland*, 351 Or 113, 120-22, 263 P3d 975 (2011); we will not repeat that discussion here.

[6]     ORS 238.660(1) provides, in part, that "[PERF] is declared to be a trust fund, separate and distinct from the General Fund," and that PERB "is declared to be the trustee of the fund."  We quote and discuss ORS 238.660(1) at greater length below.

7

* *." *Restatement* § 1 comment a.

As to the "default rules of general trust law," at the time of the PERB actions challenged here, the Oregon Uniform Trustees' Powers Act (UTPA), *former* ORS 128.003 to 128.045 (2003), was in effect.[7] Those statutes describe the general powers of a trustee and identify some aspects of a trustee's fiduciary duties, including to act as a "prudent person" in exercising its trust responsibilities. *Former* ORS 128.009(1); *see also Restatement* § 77 (trustee has duty to administer trust as prudent person would, including exercise of reasonable care, skill, and caution). As relevant here -- and as we discuss in detail below -- a trustee has the authority "to settle a claim by or against the trust." *Former* ORS 128.009(3)(s).

The parties do not disagree, in the main, about the trust law principles that apply to PERB in its administration of PERS and the fund. They agree that PERB is obligated to comply with the statutes that establish PERS and with generally applicable trust standards mentioned above, such as the UTPA and the common law of trusts. They agree that PERB had (and has) a fiduciary duty to PERS members (including retired and active members), and that it was (and is) obligated to act for the benefit of PERS members. That said, the parties differ in their views of some of the applicable legal standards, and they disagree fundamentally in how those standards should be applied to

---

[7] The Oregon Uniform Trust Code (UTC) was enacted in 2005 and replaced the UTPA. Or Laws 2005, ch 348, § 128. The UTC does not apply to judicial proceedings commenced before January 1, 2006, such as this case. ORS 130.910(1)(a),(b).

8

the facts here.

As to the legal standards, plaintiffs emphasize the legislature's 2001 amendments, Oregon Laws 2001, chapter 945, sections 2 to 3, to two statutes that address PERB's responsibilities as trustee for the fund, ORS 238.601 and ORS 238.660(1). ORS 238.601 describes the legislature's purpose in establishing PERS. It provides, in part:

"It is the intent of the Legislative Assembly that the [PERB], in performing its duties as trustee of [PERF], recognize that the continued stability and viability of [PERS] depends on the ability of public employers and taxpayers to pay the costs of the system. Consistent with this intent, the board shall administer the system to create and maintain long-term stability and viability in the system, and shall act to achieve full funding for the benefits provided by the system, giving equal consideration to the interests of the public employer and the employee to the extent that treatment does not violate the fiduciary duties of the board. Nothing in this section shall be construed to impose a fiduciary duty on the board to consider the interests of public employers, and the board shall consider the interests of the public employers only with respect to matters unrelated to the board's fiduciary duties as trustee of the fund."

ORS 238.660(1), which declares the PERS trust and makes PERB the trustee, similarly provides, in part:

"Consistent with the legislative intent expressed in ORS 238.601, and to the extent it is consistent with the board's fiduciary duties, the board shall give equal consideration to the interests of the participating public employers and the interests of members. Nothing in this subsection shall be construed to impose a fiduciary duty on the board to consider the interests of public employers, and the board shall consider the interests of public employers only with respect to matters unrelated to the board's fiduciary duties as a trustee of the fund."

Plaintiffs assert that the final sentences in those statutes were added by the legislature in 2001 to make it clear that PERB has no obligation "to consider the interests of public employers" and that PERB is to consider the interests of employers "only with

9

respect to matters unrelated to [PERB's] fiduciary duties as trustee of the fund."  In plaintiffs' view, that change demonstrates that whenever PERB has any discretion in administering PERS -- as opposed to specific obligations imposed or actions prohibited by statute -- it must show "uncompromising rigidity" in acting solely for beneficiaries. Plaintiffs argue that traditional notions of fiduciary duty, reinforced by the 2001 amendments, demonstrate that PERB's obligation to maximize member benefits trumps its statutory obligation to consider "the long-term stability and viability" of PERS, ORS 238.601.

PERB and intervenors, on the other hand, focus on the statutory requirements that control many of PERB's decisions -- such as the obligation to fund a contingency reserve, ORS 238.670(1), and to provide PERS members with the pension benefits to which they are entitled under the terms of the PERS statutes.  They also emphasize the requirement in ORS 238.601 that "the board shall administer the system to create and maintain long-term stability and viability in the system."  In the view of PERB and intervenors, PERB meets its fiduciary duty to all PERS members if it pays the benefits provided by law and maintains the long-term stability and viability of the system. They argue that no principles of trust or fiduciary duty law require a trustee to maximize benefits to certain categories of beneficiaries, and that, in making trust decisions, the trustee properly may take into account preservation of the trust corpus and avoidance of unreasonable risks to the trust and its beneficiaries.  They note that, when a trustee acts reasonably, given all the circumstances, and does not engage in self-dealing or other plainly improper conduct, courts are -- and should be -- reluctant to second-guess the

10

trustee's judgment.

We do not fully agree with the applicable legal standards as articulated by either side.  Plaintiffs are correct that the wording added to ORS 238.601 and ORS 238.660(1) in 2001 expressly rejects the idea that PERB owes any "fiduciary duty" to public employers.  However, plaintiffs are incorrect in stating that ORS 238.660(1) requires PERB to direct all earnings in excess of the assumed earnings rate (currently 8 percent) "to member employee accounts."  Contrary to plaintiffs' assertions, there is no statutory obligation for PERB to credit Tier One regular accounts with more than the assumed earnings rate, even in years when earnings exceed that level.  That was a central holding of *Strunk*:  PERS members have

> "no contractual right * * * to the crediting of annual earnings in excess of the assumed earnings rate to their regular accounts.  Instead, * * * for Tier One members, annual crediting at -- but not in excess of -- the assumed earnings rate is the promise that the legislature extended."

338 Or at 202.[8]  Accordingly, plaintiffs are incorrect when they suggest that it is a breach of PERB's statutory obligation for PERB to fail to credit earnings in excess of the assumed earnings rate to employee accounts.

Moreover, plaintiffs misstate the legal standard when they suggest that

---

[8]    *See also Strunk*, 338 Or at 200 (PERS statutes "evince[] no support for the proposition that Tier One members contractually are entitled to any *overage* [above the assumed earnings rate] that is not applied to administrative expenses or reserves") (emphasis in original); *id.* at 201 ("Notably absent [from the PERS statutes] is any directive that, following [application to deficits and reserves], PERB *must* apply any remaining earnings to PERS members' regular accounts.") (Emphasis in original.)

11

PERS necessarily breaches its fiduciary duty to PERS members if it "administer[s] the system to create and maintain long-term stability and viability in the system," ORS 238.601, and in so doing fails to maximize the benefits that will be paid to PERS members. On the contrary, common-law trust principles recognize that a trustee must consider not only the amount of income or the near-term benefits for trust beneficiaries, but also the need to protect and preserve the corpus of the trust itself -- another way of referring to the stability and viability of the trust. *See Restatement* § 90 comment e (trustee must manage trust to protect capital and secure reasonable return).

That principle is particularly important given the nature of the PERS trust. A creature of statute, PERS includes tens of thousands of differently situated beneficiaries -- retired members with widely varying levels of benefits, some of whom will be receiving benefits for decades to come; family members of PERS members, who may receive death benefits at some future date; active members making decisions about retirement or about nonretirement pay-out options; active members who may be a few days or several decades from retirement, with vastly different pension rights. PERB owes duties to all those retired and active members. To suggest, as plaintiffs do, that it is a breach of fiduciary duty for PERB to consider the stability and viability of PERF or PERS, or to take any action with respect to excess funds other than crediting them to Tier One employee accounts, is an unreasonably narrow view of a trustee's responsibility -- and a view that is not supported by case law or statute.

The *Restatement* makes it clear that a trustee's obligations are not met simply by maximizing current allocations to beneficiaries -- and certainly not to one

12

group of beneficiaries. A trustee has a duty of impartiality and, "with respect to the various beneficiaries of the trust," must administer the trust "impartially and with due regard for the diverse beneficial interests created by the terms of the trust." *Restatement* § 79(1)(a).[9] Thus, PERB must first comply with specific statutory mandates and prohibitions and, when exercising its discretion beyond those requirements, must consider the diverse interests of PERS and *all* PERS beneficiaries. As the trial court correctly stated:

> "It simply is not possible for PERB to protect the beneficial interests of PERS members without ensuring the continuing stability and viability of PERS and PERF. * * * In order to fulfill its combined duties to safeguard PERF for past, present and future PERS members and the system as a whole, PERB must have broad authority and discretion to take actions it reasonably concludes are necessary so long as such actions are not prohibited by the statutory terms of the trust."

Moreover, if a trustee makes the distributions to beneficiaries that are required by the terms of the trust -- here, the PERS statutes -- the trustee has discretion with respect to whether and when it makes additional distributions, retains assets for future distributions, or otherwise uses trust assets for the benefit of trust beneficiaries. *See* 3 *Scott and Ascher on Trusts* § 18.2, 1338 (4th ed 2007) ("A trustee's powers ordinarily are discretionary, unless the terms of the trust or applicable law makes them

---

[9] Indeed, in *Arken*, we recently held that it would be a breach of the fiduciary duty owed to PERS members generally to treat as administrative expenses overpayments erroneously made to a category of PERS retirees -- the so-called "window retirees." To allow one group of retirees to retain the erroneously paid amounts, with the costs being borne by the administrative account -- and thus by all active PERS members -- would improperly favor one group of beneficiaries over another. *See* 351 Or at 162-65.

13

mandatory."). As long as the trustee meets its duties of loyalty, prudence, and impartiality, the trustee's conduct "is subject to supervision by a court only to prevent abuse of discretion." *Restatement* § 87. We discuss those legal principles and their application to the PERB actions at issue here in greater detail below.

PERB and intervenors likewise misstate the applicable law in some respects. As noted, they argue that if retirees receive "the benefits provided by the legislature in the PERS statutes," then PERB will have met all the obligations it has to them. That conclusion ignores the statutory and common-law fiduciary duties that PERB owes to PERS members. Those obligations go beyond a PERS member's right to receive the specific benefits to which he or she is entitled by statute. PERB owes duties of loyalty, prudence, and competence to PERS members -- and the fact that PERS retirees receive the dollar amount of benefits to which they are contractually entitled does not *necessarily* mean that PERB has met those fiduciary obligations. For example, if PERB woefully mismanaged PERS for decades, but the legislature stepped in and appropriated sufficient funds to pay statutorily required pension benefits, the retirees might not have a breach of contract or other claim against the state itself, but that would not mean that PERB had met its fiduciary obligations to those retirees. Similarly, if PERF were fully funded in terms of its anticipated liabilities and reserve accounts and continued for years to generate earnings substantially in excess of the assumed earnings rate, but PERB refused to credit any of those additional earnings to employee accounts, then PERB

14

arguably would have failed to meet its common-law fiduciary obligation to certain PERS members -- even if they received their statutorily mandated pension amounts.[10]  Whether PERB has met its fiduciary obligations to members is not determined solely by whether they receive, at retirement, the pensions to which they are contractually entitled.

Similarly, PERB and intervenors oversimplify the operation of PERF when they assert that transfers of funds from one account to another account within PERF (in this case transfers between the contingency reserve and the accounts of certain employers) "have no effect" because "[a]ll the money remain[s] in the system and [is] available to pay for benefits and the system's administrative expenses."  That argument proves too much.  It would justify just the sort of accounting mischief that Judge Lipscomb identified in the *City of Eugene* case.  It should be obvious that the allocation of funds to a contingency or other reserve, to administrative accounts, to employer accounts, or to employee accounts can have a significant impact on employer contribution rates, future discretionary allocations to member accounts, and other PERS financial decisions.  Contrary to PERB's assertions, the fact that dollars remain "in the

---

[10]     This would be analogous to a closely held corporation that consistently increased its retained earnings, but failed to issue dividends to shareholders.  In those circumstances, a minority shareholder may have a breach of fiduciary duty claim against the directors.  Even then, however, courts ordinarily will find a breach of the directors' fiduciary duty to shareholders only when the directors have acted in bad faith or unreasonably, in light of all the circumstances. *Zidell v. Zidell, Inc.*, 277 Or 413, 420-21, 560 P2d 1086 (1977) (declining to find breach of fiduciary duty in directors' refusal to declare dividends, despite substantial and increasing retained earnings, where directors had not acted in bad faith and had reasonable explanation for their decision).

15

system" does not, *ipso facto*, mean that PERB has complied with its statutory or common-law obligations to PERS members (or to public employers).

To summarize, we agree with both parties that PERB owes fiduciary duties to PERS retirees and active members. We further agree that PERB must comply with statutes that require specific allocations or payments to beneficiaries and to various reserve and other accounts. As to actions that are not mandated or prohibited by statute, we agree with the parties that PERB has discretion in administering the fund and that it must exercise that discretion consistently with its fiduciary duties. We disagree with plaintiffs' view that PERB necessarily breaches its fiduciary duty if it fails to credit to active member accounts (or at least the regular accounts of active Tier One members) all earnings above the assumed earnings rate that are not statutorily directed to specific purposes. Rather, as a trustee, PERB also has a duty to protect the corpus of the fund and to manage the fund for the benefit of all PERS beneficiaries. And we disagree with PERB and intervenors that PERB's fiduciary obligations are satisfied if PERS members receive the minimum benefits to which they are contractually entitled. Rather, PERB, in exercising its discretion to allocate earnings not otherwise statutorily directed, may allocate amounts to administrative, contingency, or other accounts -- or to employee accounts -- and may take other steps to ensure the long-term stability and viability of PERS, as long as it acts in with prudence, loyalty, and impartiality, and takes actions in what it reasonably determines to be the interests of all PERS members.

A. *PERB's Settlement of the* City of Eugene *Litigation and Dismissal of its Appeal*

With that background, we return to plaintiffs' challenges to specific PERB

16

actions. It is helpful to focus first, as plaintiffs do, on their basic argument that PERB breached its fiduciary duty by settling the *City of Eugene* litigation and dismissing its appeal of the trial court judgment in that case. In doing so, we will discuss the obligations of trustees with respect to bringing and defending claims involving a trust, a discussion to which we will return as we consider other specific actions taken by PERB following the settlement agreement.

Plaintiffs assert that the settlement of the *City of Eugene* case and dismissal of the appeal was a breach of fiduciary duty because "the huge losses which would be suffered by [PERS] beneficiaries" if the trial court decision was not appealed were far outweighed by the "negligible cost of a Supreme Court appeal." Plaintiffs are incorrect in suggesting that the successful appeal of *City of Eugene* would necessarily have increased benefits to PERS beneficiaries in any particular amount.[11] The fact that an appeal might have resulted in more money in the PERS system and available to be credited to various accounts does not mean that any individual employee account necessarily would have been credited with any additional amount or that any member

---

[11]    PERB must comply with certain statutory directives, including maintaining adequate reserves, ORS 238.670, and paying member benefits, ORS 238.200, ORS 238.320, ORS 238.250. And, as this court held in *Strunk*, it must credit the assumed earnings rate on Tier One regular accounts and pay cost of living adjustments (COLAs) for retired members. 338 Or at 204-08, 213-15. However, beyond those specific directives, PERB has discretion to use moneys in the fund for statutory purposes as it sees fit. *See* ORS 238.661 ("Moneys in the [PERF] are continuously appropriated to [PERB] to carry out the purposes of [chapter 238 and 238A].").

17

would have received higher benefits.[12] Nevertheless, plaintiffs have properly alleged that PERB failed to meet its fiduciary duties to them and other PERS beneficiaries by settling the case and implementing the settlement, and they are correct that PERB's actions, if improper, caused them harm by reducing the amounts public employers must pay into PERF, lowering fund reserves, and potentially affecting benefits, at least for Tier One and Tier Two active members. We therefore turn to a consideration of the standards by which to evaluate the claim that a trustee has breached its fiduciary duty in settling a legal action involving the trust.

A trustee's obligation with respect to litigation is an application of the trustee's general obligation to act with prudence, loyalty, and impartiality in the interests of the beneficiaries. *See Restatement* §§ 77-79 (identifying those duties). The test for determining whether a trustee has fulfilled its duty in the context of settling a lawsuit involving the trust is whether the trustee has acted "reasonably," *Restatement* § 76 comment d, or, as it is sometimes phrased, has "not acted unreasonably." 3 *Scott and Asher on Trusts* § 17.10 at 1224.

---

[12] Indeed, plaintiffs make that very point in refuting -- correctly -- PERB's argument that it makes no difference whether funds are allocated to employer accounts or to the contingency account because the funds "never leave the system." *See* ___ Or at ___ (slip op at 15-16). Allocations to employee, employer, contingency, administrative, or other accounts can (depending on many factors, including PERB policy choices) affect employer contribution rates and, at least for active Tier One and Tier Two members, retirement benefits. But the same argument demonstrates why an increase or decrease in the overall fund or in total fund liabilities by a specific amount does not necessarily mean that actual benefits to individual retirees will increase or decrease by that amount.

18

When making decisions involving claims and litigation, a trustee must consider the "risks and benefits" -- as it must when making other decisions involving the trust -- but the test itself is whether the decision is a *reasonable* course of action in terms of the trust's interests. *See Pillsbury v. Karmgard*, 22 Cal App 4th 743, 762-63, 27 Cal Rptr 2d 491 (1994) (trustee exercised proper business judgment in declining to bring lawsuit where trustee considered risks and benefits and concluded that litigation was not in trust's best interest). To repeat, the standard for examining a trustee's conduct with respect to litigation is the traditional objective test of reasonableness in the circumstances: Just as a trustee must take "reasonable steps to enforce all claims held in trust," 3 *Scott and Ascher on Trusts* § 17.9 at 1220, a trustee has a "duty to defend claims against the trust," and that duty "is to do what is reasonable under the circumstances." *Id.* § 17.10 at 1224. A trustee "has a certain amount of discretion and *is liable only for abuse of that discretion* by failing to do what is reasonable under the circumstances." *Id.* (emphasis added). Indeed, "[i]t is not necessarily improper for a trustee to pay a claim, *even if the trustee does not believe that the claim is well founded*, if, under all the circumstances, including the amount involved and any surrounding doubts, it is reasonable to do so." *Id.* § 17.10 at 1224-25 (emphasis added).

The same rule applies, of course, to a trustee's decision to appeal or not to appeal an adverse court decision. During litigation, "reasonable steps" to defend a trust when it has been sued "may include taking an appeal to a higher court, compromise or arbitration of claims by or against the trust, or *even abandoning a valid claim or not resisting an unenforceable claim* if the costs and risk of litigation make such a decision

19

reasonable under all the circumstances." *Restatement* § 76 comment d (emphasis added). Put differently, "A trustee who loses in the trial court may be under a duty to appeal to a higher court, *if, under all the circumstances, it would be unreasonable not to do so.*" 3 *Scott and Ascher on Trusts* § 17.10 at 1225 (emphasis added).

Although our cases have not discussed the specific issue of a trustee's fiduciary duty in bringing, defending, or settling a lawsuit, when we have reviewed the actions of trustees, we have consistently adhered to the objective standard of assessing the "reasonableness of [the trustee's] judgment." *Rowe v. Rowe et al*, 219 Or 599, 609, 347 P2d 968 (1959). We pause to briefly discuss *Rowe*, because that case is particularly apropos here. *Rowe* involved a "discretionary" trust, where the trust instrument did not give specific directions to the trustee as to how to administer the trust -- although the trustee, of course, was required to act in the best interests of the beneficiaries. *Id.* at 604. Similarly, once PERB has met its obligations under the PERS statutes and this court's cases -- to allocate reserves as required by statute, pay statutorily required benefits, and credit Tier One member regular accounts with the assumed earnings rate -- it has discretion to use the moneys in the fund "to carry out the purposes" of PERS (and the successor state retirement plan that the legislature established in 2003). ORS 238.661.

In *Rowe*, one of the beneficiaries argued that the trustee should pay out all the accumulated income in the trust, rather than continuing to hold some of the income in trust, and the trial court agreed. This court reversed, holding that there was no evidence that the trustee had acted in bad faith, dishonestly, or from an improper motive. *Rowe*, 219 Or at 609-10. Because the trustee had acted in good faith, the only question was the

20

"reasonableness of his judgment" in deciding not to pay out immediately all of the trust's accumulated income. This court stated:

> "It is quite possible that we would have been more liberal in our treatment of the life beneficiaries had the power to decide been vested in us. But we have no right to substitute our judgment for that of the trustee. We are permitted to control the trustee only if we can say that no reasonable person vested with the power which was conferred upon the trustee in this case could have exercised that power in the manner in which it was exercised. We cannot say that the trustee's conduct in the instant case was unreasonable in this sense."

*Id.* at 609-10 (citations omitted).

Thus, the proper inquiry here is whether, under all the circumstances, it was unreasonable for PERB to settle the *City of Eugene* litigation and dismiss its appeal. For that reason, we reject plaintiffs' initial suggestion that PERB's fiduciary duty was simply to "weigh[] the negligible cost of a Supreme Court appeal against the huge losses which would be suffered by its beneficiaries."[13] That standard incorrectly states the law because, as just discussed, a trustee's obligation with respect to claims involving the trust is not a simple balancing of the out-of-pocket cost of litigation against the amount that

---

[13]    As noted above, the factual premise of plaintiffs' assertion is inaccurate because the "huge loss[]" to which plaintiffs refer is based on PERS's estimate of the amount by which its overall accrued liabilities (and thus the amounts that would have to be contributed to or earned by the fund) were reduced by the *City of Eugene* judgment. By the time that case was settled, however, all but one of the issues in the case had already been resolved by legislative action or by this court's decision in *Strunk*. *See City of Eugene*, 339 Or at 127 (so stating). And, as discussed above, even if PERB had prevailed on appeal, an increase in the amount of money in the PERS system does not necessarily mean any increase in the retirement allowance paid to any particular PERS beneficiary. *See* ___Or at ___ (slip op at 17-18).

21

might be recovered (discounted, presumably, by the possibility of not prevailing). Plaintiffs' position, however, can be recast in terms of the applicable fiduciary duty standard discussed above, as follows: Because the potential benefits to PERS of a successful appeal of the *City of Eugene* judgment were substantial and the corresponding financial cost of pursuing the appeal (and even of paying additional attorney fees to the opposing side should the appeal be unsuccessful) was modest, it was objectively unreasonable for PERB to settle the case and dismiss the appeal.

We turn to that argument. Under the terms of the settlement, PERB agreed to recalculate the amounts that the public employers who were the plaintiffs in the *City of Eugene* case were required to pay into PERS on behalf of their employees, to reduce the amount credited to Tier One employee accounts for 1999 from 20 percent to 11.33 percent, to fund reserve accounts as required by statute, and to take similar actions in its administration of the PERS system. Those actions, taken as a whole, had the effect of reducing the contributions that public employers otherwise would have been required to make to PERS; other things being equal, that reduction decreased the funds available for possible allocation to member accounts. In those circumstances, plaintiffs argue, it was unreasonable for PERB to settle the case and dismiss the appeal.

For the reasons that follow, we disagree. The PERB board members testified that they evaluated the *City of Eugene* case and concluded that it was in the best interests of the PERS system and its members to settle the case on the terms that it did. The board based that conclusion on several factors, including (1) that PERB was unlikely to prevail on appeal; (2) that achieving the certainty of a settlement and putting the *City*

22

*of Eugene* litigation behind PERS would benefit PERS and its members; and (3) that settlement would help protect the stability and viability of the PERS system. We review each of those considerations in turn.

PERB appointed a committee of board members to review the litigation, and the committee evaluated the case with counsel. They concluded that Judge Lipscomb's ruling was probably correct, that major parts of it had been written into law by the legislature, and that the appeal therefore was unlikely to be successful. At the time of settlement in early 2004, PERB already was facing a trial court judgment ordering it to make most of the accounting and other changes to which it agreed in the settlement agreement. Following extensive trial court proceedings, including summary judgment motions and a bench trial, Judge Lipscomb had issued detailed opinions, generally finding in favor of the public employer plaintiffs and against PERB. As noted, PERB had asked the trial court to stay the judgment, but it had refused. PERB had then asked the Court of Appeals to stay the judgment, but it too had refused, stating that PERB was "unlikely to prevail on the merits." The PERB board reasonably believed that it was unlikely to prevail on appeal and that settlement of the case was therefore appropriate. PERB board member Dalton testified that, in his view, "[Judge] Lipscomb was right in the major finding." Similarly, board member Rocklin explained that she did not think that certain actions of PERB challenged in *City of Eugene* "could be successfully

23

defended * * *."[14]

The board also believed -- reasonably -- that the chances of prevailing on appeal were very limited because almost all of the issues that had been decided by the trial court and that otherwise might have been addressed on appeal had, in the meantime, been enacted as part of the 2003 legislation, thus superseding Judge Lipscomb's judgment. That legislation "effectively codif[ied] the 11.33 percent figure as the correct 1999 crediting decision," *City of Eugene*, 339 Or at 127 (quoting *Strunk*, 338 Or at 216), and it imposed, as a statutory requirement, PERB's existing (but long-ignored) policy for funding the gain-loss reserve. *Id.* (citing Or Laws 2003, ch 67, § 5). Additionally, the 2003 legislation required PERB to adopt new actuarial equivalency factors, as Judge Lipscomb had ordered, and to apply those factors retrospectively to certain members who began service before 1999. *See Strunk*, 338 Or at 225-30 (describing issue and 2003 legislation). And it required PERB to recalculate existing rate orders based on the 2003 legislation. Or Laws 2003, ch 67, § 15.[15]

As part of the settlement agreement, PERB agreed to implement those

---

[14] At her deposition, Rocklin stated, "There were, certainly in my mind, parts of Judge Lipscomb's decision that I did not think could be successfully defended on appeal." The context of the statement, however, makes it clear that she was referring to PERB's earlier actions (rather than to Judge Lipscomb's decision) as that which she believed could not be defended on appeal.

[15] The legislature based the 2003 legislation, in substantial part, on a finding that PERB had committed "errors" that resulted in some employees "receiving benefits that exceed the benefits provided by law." Or Laws 2003, ch 67 (preamble).

legislative mandates. Plaintiffs identify no legal basis on which an appellate court reviewing the *City of Eugene* judgment could have avoided the effect of those legislative directives, even if it had concluded that the portions of the trial court judgment on which they were based were erroneous at the time that the judgment was issued. The board determined that PERB was not likely to prevail if it pursued the appeal of the *City of Eugene* judgment. Nothing in this record suggests that that determination was unreasonable.

Moreover, as events transpired, PERB's assessment was generally correct. When some of Judge Lipscomb's rulings in the *City of Eugene* judgment were presented to this court in *Strunk* -- through challenges to the 2003 legislation, which incorporated those rulings -- this court rejected the positions taken by plaintiffs here. This court, for example, upheld the changes to the actuarial equivalency factors ordered by Judge Lipscomb and included in the 2003 legislation. *Strunk*, 338 Or at 232-36; *City of Eugene*, 339 Or at 125-26. This court also addressed the statutory requirement that PERB fund the contingency account established by ORS 238.670(1), as required in the *City of Eugene* judgment, and the court rejected the position asserted by plaintiffs here. *City of Eugene*, 339 Or at 126 (quoting *Strunk*, 338 Or at 159). And, as noted, this court viewed the 11.33 percent crediting decision for 1999 and the funding goal for the gain-loss reserve account -- other issues that were on appeal in *City of Eugene* -- as having been codified in the 2003 legislation and no longer subject to dispute. *City of Eugene*, 339 Or at 127. Indeed, as we stated in *City of Eugene*, "the only substantive issue presented [in the *City of Eugene* appeals] that has not been resolved by the

25

intervening legislative amendments to PERS or by this court's decision in *Strunk* is whether the trial court erred when it agreed with employers that PERB unlawfully had required employers to match the earnings on members' variable accounts." 339 Or at 127. If PERB had continued with its appeal of Judge Lipscomb's decision, it is unlikely that PERS or its members would have achieved any particular benefit beyond what the plaintiffs achieved in *Strunk*. Given those circumstances, we conclude that the PERB board members appropriately evaluated PERB's prospects for success in the appeal of the *City of Eugene* judgment and reasonably concluded that they were unlikely to prevail and obtain reversal of any substantial part of the trial court judgment.

Second, PERB wanted to achieve some degree of certainty for the PERS members who were making decisions about possible retirement during this time period. PERB also considered the benefits of certainty for the PERS system as a whole, which was struggling to deal with the multiple and sometimes conflicting directives from the courts and from the legislature. At the time of settlement in early 2004, PERB was faced with a trial court judgment requiring it immediately to make complex and far-reaching changes to the administration of PERS, including recalculations of employer contribution levels, allocations to various reserve funds, and crediting decisions for tens of thousands of individual accounts going back at least six years. Moreover, the 2003 legislature had restructured the board itself and established various new accounting and other directives for PERB to implement.

Board members testified that one important reason for the settlement agreement was that PERB could not implement all aspects of both the *City of Eugene*

26

judgment and the 2003 legislation, because some of those directives conflicted. In particular, Judge Lipscomb had vacated the 1999 crediting order and directed PERB to issue a new order allocating 1999 earnings, but based on first funding the required reserve accounts and making other administrative changes. The 2003 legislation, in contrast, proposed to remedy that overcrediting prospectively by changing the statute regarding the crediting of the assumed earnings rate for Tier One accounts and requiring that COLAs for certain retirees be frozen to offset the effect of the 1999 overcrediting. However, that legislation -- which ordinarily would have superseded the prior court order -- had been challenged as unconstitutional by PERS members. By entering into the settlement agreement, PERB was able to obtain the agreement of the *City of Eugene* plaintiffs that it would *not* have to reallocate 1999 earnings, as required by Judge Lipscomb, *unless* the provisions of the 2003 legislation regarding assumed interest crediting and COLAs were held unconstitutional. PERB argues that the settlement agreement allowed it to navigate conflicting legal requirements and limit its enormously complex and expensive accounting and administrative burdens. Several board members testified that it was in the best interests of PERS members to achieve the relative certainty that the settlement brought and to implement the changes required by the 2003 legislation and the *City of Eugene* judgment in a way that would be "least painful" for PERS members. Nothing in the record suggests that the PERB board members did not believe in good faith that that aspect of the settlement agreement was an important benefit for

27

PERS members (and for the administration of PERS overall) and was a reasonable consideration in settling the case.[16]

Finally, the PERB board members testified that they believed that the settlement was in the best interests of PERS -- including the long-run interests of PERS retirees and active members -- because a settlement would help protect the financial viability and stability of the PERS system. As discussed previously, plaintiffs argue that considerations of financial "stability" and "viability" of PERS can play no part in determining whether PERB met its fiduciary obligations to PERS and its members. In their view, those terms are simply code words for reducing costs to public employers and thus any reliance on those concepts interferes with PERB's obligation to maximize the benefits that PERS members will receive.

It is basic trust law that a trustee has a duty to "protect[] trust property" and to ensure, consistently with any requirements and prohibitions specific to the trust, that funds are managed in a way that will benefit all trust beneficiaries. *Restatement* §§ 76, 79. The uncontradicted testimony of the board members establishes that they had those considerations in mind when they approached their decision about whether and on what terms to settle the *City of Eugene* litigation. PERB had just been told directly by the courts and by the legislature that it had been mismanaging PERS for years. As this court

---

[16] In *Strunk*, this court did strike down the legislature's chosen method for correcting the 1999 overcrediting decision. That does not, however, affect our conclusion that PERB reasonably saw that provision in the settlement agreement as providing a benefit to PERS members at the time PERB entered into the agreement.

28

later said in *Strunk*, PERS had unfunded actuarial liabilities in 2003 as high as $17 billion and, despite sustained economic growth and average investment returns of approximately 15 percent between 1991 and 2000, the ratio of PERS assets to projected future liabilities during that period actually declined. 338 Or at 163. The board wanted to put PERS on a more stable financial footing and take steps to ensure that PERS could meet its obligations to existing retirees and active members.

PERS also faced possible additional legislative action as a result of press and public criticism of the system -- whether fair or not -- that could have been adverse to the interests of PERS members. The board members' testimony indicates that they viewed protecting the financial interests of retirees and active members as their paramount duty -- and that they believed in good faith that restoring the financial integrity of PERS was essential to that goal. As the trial court noted, no competent evidence before the court challenged the board's "good faith and reasonable belief * * * that settlement of the *City of Eugene* appeals would promote the long-term stability and viability of PERS * * *." Having reviewed the summary judgment record, we agree. Nothing in this record suggests that PERB's decision to enter into the settlement agreement and, as part of that agreement, to dismiss the appeal of the *City of Eugene* judgment, was unreasonable. In those circumstances, "we have no right to substitute our judgment for that of the trustee." *Rowe v. Rowe et al*, 219 Or 599, 610, 347 P2d 968 (1959).

We turn then to plaintiffs' arguments that specific PERB actions were unreasonable and in breach of PERB's statutory and common-law fiduciary duties.

29

B.    *PERB's Order Setting New Employer Rates for 1998 and 2000*

Plaintiffs challenge PERB's October 2004 orders that calculated new employer rates for 1998 and 2000. Plaintiffs allege that those rate orders violated PERS statutes and constituted a breach of PERB's fiduciary duty. (In a related claim, discussed below, plaintiffs argue that PERB improperly transferred money from the contingency reserve to the employer accounts of the plaintiffs in *City of Eugene* as a result of recalculating employer contributions based on those new rate orders.) PERB responds that its actions were required by the *City of Eugene* judgment and the settlement agreement. To the extent that some aspects of PERB's calculations were not so mandated, PERB argues, they were not inconsistent with any statutory requirements and were within PERB's discretion.

We agree with PERB. As discussed above, in *City of Eugene*, the trial court held that PERB had failed to follow the PERS statutes and had otherwise improperly managed PERS for many years. The judgment in that case ordered PERB, applying the correct legal and accounting principles, to "issue new employer rate orders for 1998 and 2000, and a new earnings allocation order for the 1999 investment year." In the settlement agreement, PERB agreed to recalculate the 1998 and 2000 orders

> "as if PERB's practices and actuarial assumptions with respect to [various allocation issues] had been consistent with the law as interpreted in the [*City of Eugene*] judgment and as if PERB had, for 1999, originally allocated earnings of 11.33% to Tier 1 regular member accounts, allocated 7.5% of earnings to the contingency reserve and had fully funded the gain-loss reserve * * *."

For the reasons discussed at length above, the execution of the settlement agreement was

consistent with PERB's statutory and fiduciary duties, and thus its implementation of that agreement by, among other things, issuing new employer rate orders for 1998 and 2000 did not breach those duties. *See City of Eugene*, 339 Or 122-23 (settlement agreement implemented trial court judgment and new employer rate orders were entered "pursuant" to settlement agreement).

C.    *PERB's Order Revising the Crediting of 1999 Earnings*

Plaintiffs next argue that PERB's 2004 order reallocating 1999 earnings for Tier One regular accounts to reflect a crediting of 11.33 percent, rather than 20 percent, was a breach of fiduciary duty. Even putting the settlement agreement to one side, plaintiffs make no coherent argument as to how the revised crediting decision itself breached any fiduciary duty. Instead, they assert that neither the *City of Eugene* judgment nor the 2003 PERS legislation *required* PERS to reallocate 1999 earnings. That argument ignores the applicable breach of fiduciary standard: an objective assessment of the "reasonableness of [the trustee's] judgment." *Rowe*, 219 Or at 609. Under that standard, for reasons we will set out, the trial court correctly held that PERB did not breach any fiduciary duty.

The judgment in *City of Eugene* vacated PERB's earlier 1999 crediting order and directed PERB to enter a new order. PERB had no choice but to comply with that order. (As noted, PERB sought a stay of the trial court judgment, but that request was denied by the trial court and by the Court of Appeals.) Although the judgment did not specify the amount that should have been allocated to Tier One regular member accounts (in place of the 20 percent in the original order), the trial court's opinion stated

31

that the calculation must include funding of the contingency reserve required by ORS 238.670(1) (and not funded for more than 20 years) and funding of the gain-loss reserve that was authorized by ORS 238.670(3) (1999) and required by an existing PERB policy that PERB had failed to comply with. Judge Lipscomb did not himself decide what the appropriate crediting amount might be, but directed PERB to make a new determination "in a much less aggressive, and in a much more prudent fashion, in accordance with statutory obligations * * *."

Recalculating the 1999 crediting order taking the reserve requirements into account, PERS actuaries arrived at the 11.33 percent figure that PERB used in the new crediting order. Plaintiffs do not challenge the 11.33 percent figure as the result of an arithmetic error or as otherwise objectively unreasonable. And the 2003 PERS legislation "effectively codif[ied] the 11.33 percent figure as the correct 1999 crediting decision." *Strunk*, 338 Or at 216 (citing Or Laws 2003, ch 67, §§ 9, 13, *as amended by* Or Laws 2003, ch 625, § 12). PERB used the crediting amount that the legislature indicated was appropriate.[17]

---

[17] Plaintiffs observe that the references to the 11.33 percent crediting amount in the 2003 legislation and in the settlement agreement were in the context of an alternative remedy for the 1999 overcrediting, to be implemented only if this court held that the legislature's preferred remedy for overcrediting -- a freeze on COLAs and a change in Tier One members' earnings guarantee -- was held to be unconstitutional. That observation, however, does not alter the fact that the legislature plainly determined that 11.33 percent was "the correct 1999 crediting decision." *Strunk*, 338 Or at 216. As it turned out, of course, this court did conclude -- in response to a constitutional challenge by PERS members -- that altering the Tier One earnings guarantee and freezing COLAs was unconstitutional, *id.* at 204-08, 223-25, thus establishing the premise underlying the

Plaintiffs do not explicitly argue that the 11.33 percent crediting is a breach of fiduciary duty because member accounts -- or at least Tier One member regular accounts -- must receive all, or most, of any fund earnings beyond statutorily required reserves and necessary administrative expenses. That position, however, is implicit in other aspects of plaintiffs' arguments. To the extent that that is plaintiffs' position, we reject it for the reasons set out at ___ Or at ___ (slip op at 11) above. Tier One members have a contractual right to be credited the assumed earnings rate (currently 8 percent) on their regular accounts. In the revised crediting order, PERB credited them 11.33 percent, a figure calculated by PERS actuaries based on the fund's earnings that year and adequate funding of reserve and other accounts.

Because the revised crediting order was issued to implement a settlement agreement that PERS reasonably decided to enter into, the order was not a breach of any duty. Moreover, plaintiffs offer no reason -- and we can identify none -- why it would be objectively unreasonable for PERS to issue a new crediting order that was consistent with applicable statutes, an enforceable court judgment, and the legislature's determination of the appropriate crediting amount. Accordingly, we conclude that PERB's issuance of the revised 1999 crediting order was not a breach of its fiduciary duty.

D. *PERB's Transfer of the $61 Million from the Contingency Reserve to Employer Accounts*

Plaintiffs next argue that PERB breached its fiduciary duty by transferring

crediting order challenged here.

33

$61 million from the contingency reserve to the employer accounts of the *City of Eugene* plaintiffs in 2004. That transfer is related to the revised employer contribution rates described above. Pursuant to the settlement agreement, PERS directed its outside actuary to determine the difference between (a) the employer contributions made by the *City of Eugene* plaintiffs based on (depending on the particular plaintiff) the 1998, 2000, and 2003 contribution rates established by PERB and (b) the contributions that those employers would have made under the revised rates discussed above (that is, the rates as adjusted in 2004 to reflect the changes ordered by Judge Lipscomb and agreed to in the settlement agreement). PERB determined that amount -- which it viewed as an "overpayment" by those public employers -- to be approximately $61 million. PERB then transferred that amount from the contingency reserve to the respective employer accounts.

Before the trial court, plaintiffs argued that PERB breached its fiduciary duty in making the $61 million transfer. The trial court granted defendants' motion for summary judgment, holding that PERB "had discretion to establish * * * a method to remedy the certain shortfall" that would result from the *City of Eugene* judgment and the settlement agreement. The trial court recognized that the transfer was "inconsistent with the exact terms" of the settlement agreement and that other "sound methods" may have existed, but it nevertheless found PERB's solution "rational."

Before this court, plaintiffs argue that PERB breached its fiduciary duty both in transferring funds from the contingency reserve -- funds that otherwise would have been available for other purposes, including crediting to Tier One accounts -- to the

34

employer accounts of the *City of Eugene* plaintiffs and in calculating the amount to be transferred. They assert that the transfer and the calculation method were not *required* by the terms of the settlement agreement; that the method failed to properly take into account changes in PERS as a result of the 2003 legislation; and that the calculations relied upon estimates and "hypotheticals" about retiree payouts, rather than actual costs. Plaintiffs argue that this court's decision in *Arken* provides further support for their breach of fiduciary duty claim because *Arken* held that it was a breach of that duty for PERB to treat excessive payments to certain retirees as administrative expenses, thus shifting the cost of those improper payments to all PERS members. They assert that PERB's use of the contingency reserve to reimburse employers for the excessive contributions that the employers had made (some of which, in turn, were paid out as excessive benefits to certain retirees) shifted the costs of those excessive payments from the retirees who received them (and their former employers) to all PERS members, in violation of PERB's fiduciary duty as outlined in *Arken*. Moreover, plaintiffs suggest, this court's approval in *Arken* of the direct recoupment from certain retirees of overpayments made due to PERB's excessive crediting decision for 1999 undercuts PERB's rationale for the $61 million transfer in the first place.

Defendants concede that neither the *City of Eugene* judgment nor the agreement settling that case expressly require PERB to "transfer" any amounts to the employer accounts of the *City of Eugene* plaintiffs. They offer, however, a three-step argument in support of the $61 million transfer. First, they assert that "PERB was required * * * to make [the *City of Eugene* plaintiffs] whole for the actuarial value of the

35

benefits PERB committed to pay to these employers' retirees and current employees which exceed those for which employers lawfully could be charged."  Second, they assert that section 1.5 of the settlement agreement implements that requirement because it obligates PERB to recalculate employer contribution rates, using various assumptions, and to "treat the difference between [each employer's] contribution made pursuant to the former contribution rate orders and the corrected contribution rate orders as excess employer contributions."  Third, defendants claim that the $61 million transfer was an appropriate means of ensuring that the *City of Eugene* plaintiffs would not have to pay for excessive amounts paid or payable to their retirees based on the erroneous rate orders.

Defendants argue that no statute, rule, or common-law duty prohibits PERB from transferring funds from the contingency reserve to specific employer accounts to remedy overpayments by those employers.  The contingency reserve, they point out, may be used by PERB "[t]o pay any legal expenses or judgments that do not arise in the ordinary course of adjudicating an individual member's benefits or an individual employer's liabilities" and "[t]o provide for any other contingency that the board may determine to be appropriate."  ORS 238.670 (1)(b), (c).  In their supplemental briefing, defendants respond to this court's decision in *Arken* -- which affirmed PERB's authority to recoup certain excessive benefits from the retirees who received them -- by noting that the reasonableness of PERB's decisions in 2004, including the $61 million transfer, must be evaluated as of the time that those decisions were made, and not with the benefit of hindsight.  Defendants acknowledge that *Arken* "changes at least one of the assumptions underlying" the settlement agreement, but argue that, in 2004, "it was entirely reasonable

36

for PERS to assume that it would not be able to recoup most of the unlawful benefits." In those circumstances, defendants argue, PERB's decision to transfer funds from the contingency reserve to the public employer accounts was objectively reasonable.

For the reasons that follow, we conclude that the trial court erred in granting summary judgment for defendants. We first reject the argument that PERB's decision to transfer $61 million from the contingency reserve to certain employer accounts can be justified as required by the settlement agreement. The settlement agreement makes no mention of any such transfer, nor does it even suggest that the parties contemplated an actual transfer of funds to the public employer accounts. Rather, it refers only to the way the public employers' contribution overpayments are to be treated by PERB and to the fact that PERB will use funds in the contingency reserve to cover any costs that it incurs "that are not covered by the [public employers'] recalculated rates." Thus, although we have concluded that the terms of the settlement agreement were reasonable and consistent with PERB's fiduciary duty, that conclusion does not dispose of plaintiffs' claim that the $61 million transfer was neither of those things. The reasonableness of the transfer must be evaluated on its own.

On this record, we cannot determine whether PERB's decision to transfer the $61 million was consistent with its fiduciary duty. Here, as discussed in detail above, because no specific statute or trust provision either required or prohibited the transfer, the standard for determining whether PERB violated its fiduciary duty is whether, in light of all the circumstances, its action was objectively reasonable. Although the trial court concluded that PERB's decision to approve the transfer was "rational," in our view that

37

determination depends on facts that the parties dispute.

We return to the provisions of the settlement agreement that set out PERB's obligations regarding employer contributions that the *City of Eugene* plaintiffs had made pursuant to rate orders that had been held to be unlawful. Section 1.5 of the settlement agreement provides that PERB will recalculate the employer rate orders based on the *City of Eugene* judgment -- and no one disputes that PERB did so. Plaintiffs do not identify any particular calculation or other errors by PERB or suggest the correct amount of the overcharge. The settlement agreement also provides that PERB will treat the difference between the contributions made under the initial orders and the amounts that should have been contributed as "excess employer contributions." Under those provisions, it appears that any overpayments by public employers based on the erroneous rate orders were not intended to be (and were not) refunded from the employer accounts within PERF to the employers themselves, but rather were to remain in the employer accounts as "excess employer contributions" to be used for the purposes identified. No party argues that those parts of the settlement agreement were not implemented or that the overpayments were not treated, for accounting purposes, as specified in the settlement agreement.

From the record before us, it appears that the public employer plaintiffs in the *City of Eugene* case would have suffered harm based on their overpayments to their employer accounts *only* when funds were transferred out of those accounts and to the benefits-in-force (BIF) reserve, when particular employees retired between 1998 and July 1, 2004, under benefit formulas that were later determined to be excessive. It appears that the $61 million transfer was intended to ensure that the *City of Eugene* plaintiffs

38

would be made whole for the cost to them of any excessive payments made to their retirees. The factual dispute that we perceive is whether the actual amounts transferred out of the employer accounts of the *City of Eugene* plaintiffs to the BIF for the benefit of those who retired with improperly high benefits amounted to approximately $61 million.

Plaintiffs argue that the amount of the transfer had little to do with the actual amounts that the *City of Eugene* plaintiffs were required to transfer to the BIF for those retirees. They note that PERS's actuaries were not asked to, and did not, consider the actual number of retirements for any of the *City of Eugene* plaintiffs during the relevant time period. They point to the deposition testimony of one of PERS's actuaries who conceded that PERB's methodology could grossly overestimate the cost of those retirees to an employer. Defendants respond that the transfer was to "cover the actuarially-forecasted cost of providing projected future benefits," and was never intended to be a dollar-for-dollar reimbursement of overpayments by those public employers.

As noted, the trial court agreed that a shortfall was "certain," and, further, that the transfer was a "rational" method to remedy that shortfall. We agree with the trial court that *some* shortfall was certain -- it was clear that some employees of the *City of Eugene* plaintiffs had retired during the relevant period and were receiving benefits that later were determined to be excessive. PERS presumably transferred amounts from employer accounts to the BIF for the benefit of those retirees, and those amounts were presumably larger than they would have been, but for the excessive benefits the retirees were to receive. But we disagree with the trial court that the record provides a sufficient

39

factual basis to conclude that the transfer of $61 million from the contingency reserve to the public employer accounts was a reasonable or rational method to "remedy" the shortfall. In our view, it is not possible to determine whether the $61 million transfer -- which was based solely on the difference in the initial and the revised employer contribution rates -- was reasonable without at least *some* consideration of the relationship between that amount and the actual financial harm to the *City of Eugene* plaintiffs.

On remand, the trial court must consider whether the $61 million transferred bore a rational relationship to some actual financial harm suffered by the *City of Eugene* plaintiffs -- such as amounts that were transferred from the employer accounts of the *City of Eugene* plaintiffs to the BIF reserve for the benefit of retirees who retired with excessive benefits and that cannot be recovered from those retirees.[18] Moreover, the trial court also should consider whether a transfer in that amount, or in some other amount, is consistent with PERB's fiduciary obligations. Those inquiries may involve actuarial analyses and projections, such as those considered by PERB when it calculated and made the transfer, but they must also involve consideration of actual or estimated

_____

[18] Plaintiffs argue that PERB improperly used estimates, hypotheticals, and actuarial assumptions in arriving at the $61 million transfer figure. We do not agree with plaintiffs that those techniques can play no role in determining the amount of any shortfall or of a transfer of funds, as occurred here. PERS is a complex system, and estimates, projections, and point-in-time comparisons are a necessary part of administering the system. Here, however, there is a factual dispute over whether the $61 million transfer was rationally related to the harm suffered by the *City of Eugene* plaintiffs.

40

numbers of relevant retirees of the *City of Eugene* plaintiffs and the actual or estimated impact of those retirements on the employer accounts.[19] It may also be appropriate for the trial court to consider PERB's policies for accounting for overpayments to retirees that are later recovered under ORS 238.715. In *Arken,* this court held that PERB could recover overpayments to retirees, including at least some of the overpayments that led to the excessive public employer contributions at issue here. *Arken v. City of Portland*, 351 Or 113, 172, 263 P3d 975 (2011). We express no opinion as to the impact of those policies, if any, on the reasonableness of the $61 million transfer, but it appears that at least some of the "losses" to the *City of Eugene* plaintiffs were related to excess benefits paid to the "window retirees," and it now appears that PERS will recover some portion of those overpayments.[20]

For the foregoing reasons, we conclude that there are disputed issues of fact regarding the harm to the *City of Eugene* plaintiffs as a result of the overpayments and the relationship between the harm that they suffered and the $61 million transfer. Because of

---

[19] Plaintiffs point out that, according to PERS's actuary Dale Orr, PERS no longer uses the "truing up" method of ensuring that sufficient funds are in the BIF, but rather allocates BIF assets and liabilities among employers based on the actual retirements of each employer's employees. The record does not disclose when that change was made or whether that change may affect PERS's ability to provide information relevant to the factual disputes that we have identified.

[20] We recognize that PERB's conduct in approving the transfer must be evaluated as of the time of the transfer (2004), and not in light of later events. Nevertheless, PERS policies (if any) as to accounting practices for overpayments to retirees that are later recovered may be relevant to a determination as to whether PERB's decision to approve the transfer was objectively reasonable.

41

those disputes, it is not possible, on this record, to determine whether that transfer was an objectively reasonable method to remedy that harm, when considered in addition to the provisions of the settlement agreement. Accordingly, the trial court erred in granting summary judgment for defendants on that claim.

E. *Employer-in-Variable Issue: Transfer of Improperly Credited Amounts from Employer Accounts to Contingency Reserve*

As discussed previously, several PERS members intervened in the *City of Eugene* litigation to defend the PERB policies that the public employer plaintiffs had challenged and to assert claims of their own. Judge Lipscomb agreed with the intervenors on one issue, concluding that PERB had breached its fiduciary duty to PERS members when it credited to *employer* accounts some of the income earned on funds in the variable account in 1999. He held that, because the employer moneys had not been invested in the variable account during that year, it was improper for PERB to divert earnings from funds in the variable account to employer accounts. Judge Lipscomb did not specify how that improper allocation should be remedied. In the settlement agreement, PERB agreed to "transfer[] from employer accounts to the contingency reserve * * * the amount determined by the PERS actuary to have been improperly credited to employer accounts according to the judgment." PERB later implemented that provision of the agreement.

Plaintiffs assert that this aspect of the settlement agreement, and its implementation, violate PERB's fiduciary duty to PERS members. They argue that the agreement was made "without regard to the interests of members" and that the

42

reallocation was "in a manner consistent with the employers' interests rather the interests of the employees who prevailed on the issue." In their view, those amounts "are earnings in excess of the assumed earnings rate," and "PERB [was] required to direct those earnings to member employee accounts."[21] Defendants respond that PERB acted reasonably in reallocating those amounts to the contingency reserve, given the substantial underfunding of that reserve in earlier years and the underfunded status of PERS as a whole. They further argue that nothing required PERB to allocate all earnings in excess of the assumed earnings rate to employee accounts.

We agree with defendants. As stated earlier, plaintiffs' assertion that earnings above the assumed earnings rate must be credited to employee accounts is incorrect. PERB acted improperly, as Judge Lipscomb held, when it credited some of the variable account earnings to *employer* accounts, but the remedy that PERB adopted -- transferring the improperly credited amounts from the employer accounts to the contingency reserve -- was reasonable. The contingency reserve benefits PERS members by ensuring sufficient moneys to fund the PERS system, including appropriate crediting to employee accounts, coverage of administrative expenses, and payment of retiree benefits when due. *See* ORS 238.670(1) (describing purposes of contingency reserve). Those purposes benefit all PERS members. PERB board members concluded that it was

---

[21] Plaintiffs do not argue that PERB's reallocation decision caused PERS members with variable accounts to receive lower earnings on those accounts than they were contractually entitled to receive.

in the best interests of PERS members and consistent with ORS 238.670(1) to transfer the amounts from the variable account that PERB had incorrectly credited to employer accounts to the contingency reserve. There was and is no statutory requirement that all earnings in excess of the assumed interest rate be allocated to Tier One regular accounts. PERB exercised its discretion to use those earnings to help rebuild the contingency reserve. Nothing in the record suggests that that decision was unreasonable.

F.    *Adoption of "Money-Match" Calculation Rule*

Plaintiffs also challenge PERB's adoption of OAR 459-013-0280, which sets out the method for calculating money match benefits for PERS members who participate in the variable account program. We briefly describe the context in which that rule was adopted.

In his decision in *City of Eugene*, Judge Lipscomb agreed with the public employer plaintiffs that PERB's requirement that employers match the earnings in their employees' variable annuity accounts was inconsistent with the PERS statutes and "has required employers to pay much larger contributions to the fund than would be necessary to fund the statutorily authorized pensions and has increased their unfunded liabilities." In the settlement agreement, PERB agreed to promulgate a rule that essentially adopted what Judge Lipscomb had determined was the correct way to calculate the money-match benefit for members who participated in the variable account. PERB adopted such a rule, effective in July 2004.

In the single paragraph in their brief devoted to this challenge, plaintiffs assert that the calculation method set out in the rule is "convoluted and illogical" and

44

refer to a brief filed by the intervenors in the *City of Eugene* appeal. Plaintiffs, however, offer no argument to this court, and have presented no evidence in this case, that the calculation method set out in the rule was objectively unreasonable or inconsistent with any statute or that only some other calculation method would be consistent with PERB's fiduciary duty. Nor do they explain why it was unreasonable for PERB to adopt a rule that was consistent with the directive of the trial court order in *City of Eugene.* Accordingly, plaintiffs' claim that PERB breached its fiduciary duty in adopting the rule fails.

G.    *Payment of Attorney Fees*

Finally, plaintiffs argue that PERB breached its fiduciary duty by paying attorney fees to the plaintiffs in the *City of Eugene* litigation. They argue that PERB should not have paid the plaintiffs' costs, including expert witness costs; that it was improper to pay any fees in excess of what would have been awarded by the court in a proceeding under ORCP 68; and that the fee award did not properly distinguish between fees related to claims on which the plaintiffs prevailed and fees related to the plaintiffs' unsuccessful claims. Plaintiffs' arguments are unpersuasive.

First, the trial court judgment *awarded* attorney fees to the public employers who were the plaintiffs in the *City of Eugene* case, and plaintiffs offer no argument as to how, in those circumstances, it could have been a breach of fiduciary duty for PERB to agree to pay some attorney fees as part of a settlement agreement and then to pay those fees. Second, plaintiffs ignore the procedural posture in which this issue arises. We are not reviewing a trial court order awarding fees in a particular amount. Instead,

45

we are reviewing action that PERB took to implement one part of an arm's-length settlement agreement. The standards are different. As discussed above, a trustee's duty in defending litigation involving the trust is to do what is reasonable, and the trustee "has a certain amount of discretion and is liable only for abuse of that discretion by failing to do what is reasonable under the circumstances." 3 *Scott and Ascher on Trusts* § 17.10 at 1224. That discretion necessarily includes the decision to settle a case, the terms of settlement, and, if not unreasonable, the agreement to pay attorney fees as part of the settlement.

PERB's counsel reviewed the billing records of plaintiffs' attorneys in the *City of Eugene* litigation and used that information in negotiating the settlement agreement, including the amount that PERB agreed to pay in attorney fees. It is undisputed that the amount that PERB paid was less than the amount that the plaintiffs' counsel billed and collected from the *City of Eugene* plaintiffs. Plaintiffs in this case have presented no evidence that PERB failed properly to evaluate the decision to pay fees or the amount of the fees that it agreed to pay, as part of determining that it was in the best interests of PERB to settle the *City of Eugene* litigation. There is no support in the record for the claim that PERB acted unreasonably in agreeing to pay the fees that it did.

## IV. CONCLUSION

For the reasons set out above, PERB's decision to settle the *City of Eugene* case and dismiss its appeal of the trial court judgment in that case was reasonable and did not breach its fiduciary duty to PERS members. Additionally, the specific actions that PERS agreed to take in the settlement agreement, and later did take, were not

46

unreasonable in the circumstances. Accordingly, those actions did not breach PERB's common-law or statutory fiduciary duties to PERS members, nor were they based on an erroneous interpretation of law and therefore subject to being reversed or remanded under ORS 183.484(5).

We conclude, however, that the trial court erred in granting summary judgment in favor of defendants on plaintiffs' claim that PERB breached its fiduciary duty by transferring $61 million from the contingency reserve to the employer accounts of the *City of Eugene* plaintiffs as a remedy for excessive payments that those employers had made as a result of PERS's improper crediting and other decisions in earlier years. That transfer was not required by the terms of the settlement agreement. Moreover, as discussed above, factual disputes preclude a determination, on this record, that the transfer was objectively reasonable in light of all the circumstances and consistent with PERB's fiduciary duty. We therefore reverse that portion of the trial court judgment and remand the case to the trial court for further proceedings.

The judgment of the circuit court is affirmed in part and reversed in part, and the case is remanded to the circuit court for further proceedings.