FLYNN, J.
**425 Plaintiffs seek a declaration that the City of Lake Oswego must allow them recreational access to Oswego Lake, either from the shoreline of the city's waterfront parks-from which the city prohibits all water access-or through the city's residents-only swim park. According to plaintiffs, the common-law doctrines of public trust and public use protect the public's right to enter the lake, and the city's restrictions on access to the lake are contrary to those common-law doctrines. Plaintiffs also contend that the city's restrictions violate the Equal Privileges and Immunities guarantee of the Oregon Constitution, Article I, section 20. Defendants are the City of Lake Oswego and the State of Oregon, as well as the Lake Oswego Corporation, which holds title to riparian rights to the lake.[1] The case reaches this *6 court following a summary judgment in which the trial court assumed that the lake is among the public waterways to which the doctrine of public trust or public use applies but held that neither those doctrines nor Article I, section 20, entitle plaintiffs to the declarations that they seek. The Court of Appeals affirmed, also without deciding whether the lake is a public waterway and this court allowed review.
We conclude that the trial court correctly granted summary judgment on plaintiffs' Article I, section 20, challenges. We also conclude that neither the public trust nor the public use doctrine grants plaintiffs a right to enter the swim park property and that the public use doctrine does not grant plaintiffs a right to access the water from the waterfront parks. But we conclude that, if Oswego Lake is among the navigable waterways that the state holds in trust for the public, then neither the state nor the city may unreasonably interfere with the public's right to enter the water from the abutting waterfront parks. Accordingly, the case **426 must be remanded for resolution of the preliminary question of whether the lake is subject to the public trust doctrine and, if the lake is subject to that trust, then for resolution of the factual dispute regarding whether the city's restriction on entering the lake from the waterfront parks unreasonably interferes with the public's right to enter the lake from the abutting waterfront parks.
I. BACKGROUND
Most of the land surrounding Oswego Lake is privately owned, but the city has an interest in four properties that abut the lake. Along an area of the lake known as Lakewood Bay, the city has created three waterfront parks, called Millennium Plaza Park, Sundeleaf Plaza, and Headlee Walkway. The fourth property is a small swim park on city land abutting the shore of the main lake.
Recorded ownership claims to the land surrounding Oswego Lake date to 1850, when two early settlers staked a federal Donation Land Claim to land abutting what was then called Sucker Lake. Eventually, a company called Oregon Iron & Steel acquired all of the property surrounding the lake and, over time, built dams and an artificial channel. Those projects increased the lake to its current size. In the early 20th century, Oregon Iron & Steel created a residential development around the lake. In doing so, the company platted subdivisions and changed the lake's name to "Oswego Lake." When the company sold off the lots abutting the lake, it reserved to itself ownership of the riparian rights and then transferred those rights to Lake Oswego Corporation, whose shareholders-waterfront property owners and others-pay dues in exchange for access to the lake.
During the same era, Oregon Iron & Steel deeded two parcels of waterfront land to the city, with a covenant that the land was to be used "by the resident children of Lake Oswego" for purposes of recreation. Those parcels became the swim park, which is open during July and August each year. The swim park land is fenced on three sides and bordered on the water side by a fenced dock, which creates a small, enclosed swimming area-smaller than an Olympic-size pool-and prevents access from the park to the open **427 lake. The city limits use of the park to city residents and limits water activities to swimming.[2]
More recently, the city acquired the properties on which the three downtown, waterfront parks are located. Two of those parks, Headlee Walkway and Sundeleaf Plaza, have physical barriers that prohibit entry into the water. Millennium Plaza Park, which the city acquired through condemnation, has steps that lead from the park to the water. Millennium Plaza Park also has a grassy area from which plaintiff Prager entered the lake in the past. Although the waterfront parks are open to the public, the city has prominently posted signs at Millennium Plaza Park announcing, *7 "Private Lake. Please stay on the steps." The city also passed a resolution prohibiting entry into the water from the city's waterfront parks. That resolution provides, in pertinent part:
"It is prohibited for any person to enter Oswego Lake from Millennium Plaza Park, Sundeleaf Plaza or the Headlee Walkway by any means or method, including, without limitation, by wading or swimming, or by using water vessels or other floatation devices.
"20. Leaving the Pathway Portion of the Headlee Walkway
"It is prohibited for any person to leave the pathway portion of the Headlee Walkway when using that facility, or to climb, traverse, or occupy the fencing or the planted areas adjacent to the path."
(Underscoring in original.)
Plaintiffs, who have no access to the private land surrounding the lake, filed suit under the Uniform Declaratory Judgments Act, ORS 28.010 to 28.160. They alleged that they have an interest in swimming in and kayaking on the lake, and they sought declarations that the city's waterfront-parks resolution and the city's resident-only policy for the swim park are invalid. Plaintiffs' amended complaint asserts three bases on which they contend that the restrictions are invalid.
**428 In their first claim, plaintiffs allege that, even if the beds of Oswego Lake are privately owned, the waters of the lake are owned by the State of Oregon and
"are held in trust for the preservation of the public right of recreation, including paddling, canoeing, boating, and swimming, and other public rights which all citizens enjoy in such waters under common law[.]"
Thus, plaintiffs allege, the resolution and residents-only swim park rule are unlawful and preempted by the "Public Trust Doctrine and/or Public Use Doctrine."
In their second claim for relief, plaintiffs similarly allege that the resolution and swim park rule are unlawful and preempted by the "Public Trust Doctrine and/or Public Use Doctrine." But on this claim, plaintiffs request a declaration that "the submerged and submersible lands below the ordinary high water mark of the Lake have been and are owned by the State of Oregon and held in trust for the public since the time of statehood[.]"
Finally, in their third claim for relief, plaintiffs allege that both the waterfront-parks resolution and the swim-park rule violate Article I, section 20, of the Oregon Constitution, by effectively "granting to a small class of citizens monopolistic privileges of access to the waters of the Lake, which upon the same terms, did not equally belong to all citizens."
Plaintiffs filed a motion for partial summary judgment on their first claim, contending that the public has a right to use the lake as a matter of law, regardless of ownership, and defendants each filed cross-motions for summary judgment. In resolving the motions against plaintiffs' first two claims, the trial court assumed that the public has a right to use the lake under the "public trust" and "public use" doctrines, but the court determined that neither doctrine gave the public a right to use the city's land to reach the water. Thus, the trial court granted defendants' motions against plaintiffs' common-law claims and declined to resolve the preliminary question of whether the public has a right to use the lake under either the "public trust" or "public use" doctrine. The trial court also determined that **429 the city's policies did not violate Article I, section 20, and, therefore, granted defendants' summary judgment on the third claim for relief as well. The Court of Appeals agreed with the trial court's reasoning and affirmed the grant of summary judgment to defendants. Kramer v. City of Lake Oswego , 285 Or. App. 181, 183-84, 395 P.3d 592 (2017).[3] We allowed plaintiffs' petition for review. *8 II. ANALYSIS
As the case is presented to this court, we assume-without deciding-that Oswego Lake is among the navigable waterways that the state holds in trust for the public. Neither the trial court nor the Court of Appeals addressed the preliminary question of the lake's status, and defendants do not contend that the lake's status can be resolved as a matter of law. Defendants argue instead that, regardless of the public's interest in the lake as a whole, the Court of Appeals correctly concluded that plaintiffs are not entitled to the declaratory relief that they have sought. We agree with the Court of Appeals in part. We conclude that, regardless of the lake's status, neither the public use doctrine nor Article I, section 20, entitle plaintiffs to the declarations that they seek. However, if plaintiffs are correct that the lake is a navigable waterway subject to the public trust doctrine, then genuine issues of material fact preclude a determination on summary judgment that the city is authorized to prohibit the public from entering the water from the public waterfront parks. Accordingly, we reverse the judgment for defendants on plaintiffs' second claim for relief and remand for the trial court to resolve the remaining issues, including whether the lake is publicly owned.[4]
Plaintiffs' three claims for relief all depend to some extent on their premise that the assumed public interest in **430 Oswego Lake includes a right of access to the water from the abutting upland. Thus, we begin with an overview of the public's interest in waterways, generally.
A. Overview of the Public Right to Use Oregon Waters
In Oregon, two related doctrines create a public right to use certain bodies of water, regardless of who owns the abutting upland. The first applies to bodies of water that are considered navigable as a matter of federal law. Title to the lands underlying those navigable waters passed to the state when Oregon was admitted into the Union, to be "held in trust for the public uses of navigation and fishery[.]" Corvallis Sand & Gravel v. Land Board , 250 Or. 319, 334, 439 P.2d 575 (1968) (quoting Winston Bros. Co. v. State Tax Com. , 156 Or. 505, 511, 62 P.2d 7 (1936) )[5] ; PPL Montana, LLC v. Montana , 565 U.S. 576, 591, 132 S. Ct. 1215, 182 L. Ed. 2d 77 (2012) (explaining statehood transfer of title to the lands underlying navigable waters). The second doctrine recognizes a public right to use other waterways, even if title to the underlying land is privately held, as long as the water is "navigable in a qualified or limited sense." Luscher v. Reynolds , 153 Or. 625, 631, 634, 56 P.2d 1158 (1936).
The first doctrine originates with the British claim to ownership of the land that became the United States. PPL Montana , 565 U.S. at 589-90, 132 S.Ct. 1215. At English common law, the crown was considered to hold title to the beds of "waters subject to the ebb and flow of the tide[.]" Id. at 589, 132 S. Ct. 1215 ; see also Pacific Elevator Co. v. Portland , 65 Or. 349, 379, 133 P. 72 (1913). Dominion over those waters was deemed "vested" in the crown "as the representative of the nation and for the public good." Pacific Elevator , 65 Or. at 379, 133 P. 72. Thus, "the public retained the right of passage and the right to fish in the stream." PPL Montana, 565 U.S. at 589, 132 S.Ct. 1215.[6]
*9 **431 The British monarchs claimed the same authority over the bodies of water on the American continent, and that claim of the sovereign's dominion was transferred to the original thirteen states following the American Revolution. Pacific Elevator , 65 Or. at 379, 133 P. 72. However, the British concept of tidal influence failed to account for the "vast number of major inland rivers upon which navigation could be sustained" on this continent, so the doctrine was expanded in this country to include sovereign (or state) ownership of the beds of bodies of water that were "really navigable," even if not obviously affected by the tides. PPL Montana, 565 U.S. at 590, 132 S.Ct. 1215 ; see also Illinois Central Railroad v. Illinois , 146 U.S. 387, 436-37, 13 S. Ct. 110, 36 L. Ed. 1018 (1892) (explaining that doctrine of sovereign ownership "is founded upon the necessity of preserving to the public the use of navigable waters from private interruption and encroachment, a reason as applicable to navigable fresh waters as to waters moved by the tide"-and thus that "the lands are held by the same right in the one case as in the other, and subject to the same trusts and limitations").
As the other states later joined the union, with the status of "coequal sovereigns under the Constitution[,]" the same principle of ownership was extended to waters within **432 the borders of each state. PPL Montana , 565 U.S. at 591, 132 S.Ct. 1215. Thus, "the people of each State, based on principles of sovereignty, 'hold the absolute right to all their navigable waters and the soils under them,' subject only to rights surrendered and powers granted by the Constitution to the Federal Government." Id. at 590, 132 S. Ct. 1215 (quoting Martin et al. v. Waddell, 41 U.S. (16 Pet.) 367, 410, 10 L. Ed. 997 (1842) ). Because that right of ownership arose as a result of the new states' constitutional status as coequal sovereigns, it is known as the "equal-footing doctrine,"[7] and the question of which waters are "navigable" for purposes of state ownership must be determined as a matter of federal law. PPL Montana, 565 U.S. at 591, 132 S.Ct. 1215.[8]
In addition to that doctrine of public ownership of the lands underlying navigable bodies of water, Oregon also enforces the public's right to use other waterways that are "navigable in a qualified or limited sense." Luscher , 153 Or. at 634, 56 P.2d 1158. Waterways subject to that doctrine are sometimes referred to as water that is "navigable in fact," which distinguish them from waterways that are "navigable" under federal law. Shaw v. Oswego Iron Co. , 10 Or. 371, 375, 45 Am. Rep. 146 (1882). The doctrine, known as the right of "public use," initially was applied primarily to facilitate the floating of logs down rivers that did not meet the federal test for navigability. See, e.g. , *10 Lebanon Lumber Co. v. Leonard , 68 Or. 147, 136 P. 891 (1913) ; Weise v. Smith , 3 Or. 445, 450, 8 Am. Rep. 621 (1869). The same doctrine, however, has long recognized that the public has a "superior right" to use the water for other navigational purposes, including a "boat used for the transportation of pleasure-seeking passengers[.]" Luscher , 153 Or. at 635, 56 P.2d 1158 ; see also **433 Guilliams v. Beaver Lake Club , 90 Or. 13, 27, 175 P. 437 (1918) ("Even confining the definition of navigability, as many courts do, to suitability for the purposes of trade and commerce, we fail to see why commerce should not be construed to include the use of boats and vessels for the purposes of pleasure.").[9] As to those bodies of water subject to the doctrine of "public use," this court has explained that "the public has an easement" because the waters are "deemed public highways" for purposes of navigation and commerce. Luscher , 153 Or. at 635, 56 P.2d 1158 (quoting Guilliams , 90 Or. at 19, 175 P. 437 ).
Thus, for waterways subject to the "public trust" doctrine, the public has a right to use water because the state owns the underlying land in trust for the public, while for waterways subject to the "public use" doctrine, the underlying land remains privately owned. We have emphasized, however, that for either category of waterway, "the public has the paramount right to the use of the waters." Id. at 634-35, 56 P.2d 1158. With the benefit of that overview, we proceed to a more detailed consideration of each of plaintiffs' claims.
B. Plaintiffs' Right to Gain Access from Land Under the "Public Use" Doctrine
In their first claim for relief, plaintiffs contend that, regardless of ownership of the underlying land, the public has a right to use the water of the lake that includes a right to access the water from the city-owned land that abuts the water. This claim rests on the second of the two doctrines discussed above, the "public use" doctrine. We conclude that the theory behind the doctrine of "public use" does not extend to a right to demand access across the abutting upland to reach the public water. As explained above, the theory of **434 the "public use" doctrine is explained as an "easement" to use the water "highways" of the state. See, e.g. , Shaw , 10 Or. at 375 (streams that are "navigable in fact" are considered "public highways," on which "the public have an easement for the purposes of navigation and commerce, but title of the subjacent soil to the middle of the stream[ ]" is privately held); Guilliams , 90 Or. at 19, 175 P. 437 (same).
Thus, this court has applied the doctrine to prevent those who own the underlying land from interfering with the public's use of the waterway as it flows over that private land. See Luscher , 153 Or. at 625, 56 P.2d 1158 (disputed ownership to part of land along and underlying Blue Lake could not prevent owners of other lakefront property from navigating recreational boats into section of lake abutting land that they did not own); Hallock v. Suitor , 37 Or. 9, 60 P. 384 (1900) (upstream owner had right to construct dam on her land but could not block the stream down which public had a right to float logs); Weise , 3 Or. at 446 (downstream land-owner could not prevent placement of temporary boom necessary for the successful floating of saw logs down the Tualatin River). But this court has not applied the principle of a public easement to use the waterway to create a different and additional public easement to use the abutting upland to reach the water in the first place.
Indeed, this court has written that where "the bed and banks of the stream are owned by the riparian proprietor, the navigability of the stream does not give to the navigator a right of way on the land. That *11 can be acquired only by the exercise of the right of eminent domain." Lebanon Lumber , 68 Or. at 150, 136 P. 891. Lebanon Lumber also endorses the established rule that "[t]he right of navigation ceases *** at the water's edge" and that the "public have, therefore, as against the riparian owners, and as incident to the right of navigation, no common-law right to use the land adjoining a river above the high-water mark." Id. at 150, 136 P. 891 (quoting John M. Gould, A Treatise on the Law of Waters § 99, 191 (3d ed. 1900) (internal quotation marks omitted)). We emphasized a similar point in Guilliams , in which we concluded that the plaintiffs had "a right to navigate the stream down to and across the lands of" a downstream owner, but that they did not have "any right to land at any point on defendant's land **435 without permission." 90 Or. at 30, 175 P. 437 ; see also Haines v. Hall , 17 Or. 165, 172, 20 P. 831 (1888) (even if a logger had the right to float logs down the river, he did not have a right to "station his men along its banks").
Nevertheless, plaintiffs contend that this court has also applied the doctrine of "public use" to require that abutting land owners permit "the incidental use of beds and banks of Oregon's public waterways." They rely on Weise , in which this court held that the owner of an island in the Willamette River was not entitled to recover in trespass against the defendant, who temporarily attached one line of a boom to the plaintiff's island to direct logs that he was floating downstream. 3 Or. at 451. This court phrased the question before it as: "How far, then, may one, who has an undoubted right to navigate the stream, meddle with or touch upon the bank of the stream, which is private property?" Id . at 450. In answer, this court concluded that, "[w]hile it is beyond question that the riparian owner is entitled to be protected from any unnecessary intrusion on his premises, it is equally certain that he cannot, solely for maintenance of an abstract right, or an exclusive possession, deny to the public the right of navigation." Id . at 450-51.
Out of context, the quotes from Weise could seem to lend some support to plaintiffs' argument. In context, however, Weise identifies a narrow exception to the general rule that those engaged in use of the water highways are prohibited from interfering with the land at all. We explained that the defendant, who was engaged in the business of floating logs down to a sawmill in Oregon City, out of "necessity" placed a boom above Willamette Falls to prevent the logs from being swept over the falls as they entered the river. To trap the logs, one line of the boom was temporarily attached to the plaintiff's island. But, attached in that way, the line "intercepted the most convenient course of the plaintiff's skiff, in which he was accustomed to pass to and from Oregon City, his ordinary market place." Id. at 447.
To the extent that Weise remains good law, it should be understood as a narrow exception to the rule that this court repeatedly announced in later cases, that "the navigability of the stream does not give to the navigator a right **436 of way on the land." Lebanon Lumber, 68 Or. at 150, 136 P. 891 ; see also Guilliams , 90 Or. at 30, 175 P. 437 ; Haines , 17 Or. 165, 20 P. 831. The exception appears to have been a product of two factors: first, the burden on the landowner was incidental and temporary; and second, without imposing that incidental burden on the landowner, the navigator could not continue floating his logs to the downriver sawmill. As this court emphasized in Weise , whatever right a person navigating a stream has to "meddle with or touch upon the bank of the stream," the right is based on the "necessity" of completing the process of floating logs downstream. 3 Or. at 450.
But plaintiffs do not seek just an incidental and temporary burden on the land that is a "necessity" to continue their existing use of the water. Rather, plaintiffs seek a declaration that the owner of abutting upland must allow the public to use that land to enter the lake in the first instance. The "public use" doctrine does not support that declaration. Thus, the trial court correctly granted summary judgment on plaintiffs' first claim for relief, which rests on the public's right to use a waterway even when the underlying land is privately owned.[10]
*12 C. Plaintiffs' Right to Gain Access to the Water Under the "Public Trust" Doctrine
Plaintiffs' second claim for relief alleges a right of access to the lake that is premised on the state's alleged ownership of the underlying land in trust for the public.[11] Plaintiffs' argument in support of that claim for relief depends on two premises. First, plaintiffs contend that the doctrine of "public trust" would preclude the state from unreasonably restricting access to publicly-owned water. Second, plaintiffs contend that the same limitations apply to the city. Defendants disagree with both propositions. They **437 contend that they were entitled to summary judgment on this claim because, even if the state holds title to the lands underlying Oswego Lake, that public ownership does not create a public right to enter the water from the abutting upland and, in particular, does not require the city to permit access from city-owned upland. We conclude that the trial court erred in granting summary judgment. We begin by explaining why the scope of the public's rights with respect to the navigable waterways subject to the public trust doctrine includes a right of access from public land, and we then explain why a city's authority to interfere with that right is limited to the same extent that the state is prevented from restricting public access to waters that are subject to the public trust doctrine.
1. Whether the "public trust" doctrine protects a right of passage from public land
Plaintiffs contend that the "public trust doctrine" imposes obligations on the state that would preclude it from enacting the type of restrictions on access to public water that the city has adopted. As we will explain, we agree with that proposition. We pause to emphasize, however, that the doctrine of public ownership of the beds and banks of navigable waters and the so-called "public trust" doctrine are independent doctrines, as the Supreme Court cautioned in PPL Montana , 565 U.S. at 603-04, 132 S.Ct. 1215.[12] Federal law determines whether a body of water is "navigable" and, thus, one for which Oregon acquired title to the underlying land at statehood, but state law primarily determines what the "public trust" doctrine means for those waters.[13] Id.
**438 Thus, we must determine as a matter of state law whether the public's rights with respect to publicly-owned waters includes a right to enter the water from public land. As explained above, Oregon acquired title at statehood to the lands underlying all bodies of water within the state that meet the federal test for navigability. With respect to those publicly-owned waters, this court's cases describe the public's right in terms of the beneficial interest of one for whom land is held in *13 "trust," rather than the "easement" theory that is used in the cases involving the public's right to use water flowing over privately-owned beds. For example, this court has explained that, although title passed to the state to "lands underlying the navigable waters of the state," the state's " 'rights were merely those of a trustee for the public' "; in its ownership of those lands, " 'the state represents the people, and the ownership is that of the people in their united sovereignty, while the waters themselves remain public so that all persons may use the same for navigation and fishing.' " Corvallis Sand & Gravel , 250 Or. at 334, 439 P.2d 575 (quoting Winston Bros. , 156 Or. at 511, 62 P.2d 7 ); see also Land Bd. v. Corvallis Sand & Gravel , 283 Or. 147, 151-52, 582 P.2d 1352 (1978) (also quoting Winston Bros. , 156 Or. at 511, 62 P.2d 7, for proposition that state's rights to land underlying navigable waters are "merely those of a trustee for the public"); Oregon v. Portland Gen. Elec. Co. , 52 Or. 502, 530-31, 98 P. 160 (1908) (explaining that title to the bed and banks of the Willamette River "is in the State, for the benefit of the public").
The public trust doctrine in Oregon is codified in part by statutes that declare that the waters of all navigable lakes are "of public character" and that title to what the statute refers to as "submersible and submerged lands" beneath navigable lakes is vested in the State of Oregon. ORS 274.025(1) ;[14]
**439 ORS 274.430(1).[15] The legislature uses the term "submersible lands" to "describe the land between the high-water mark and the low-water mark in both tidal and nontidal waters" and the term " 'submerged lands' to describe the land lying below the low-water mark whether in tidal or nontidal waters." Smith Tug v. Columbia-Pac. Towing , 250 Or. 612, 614-15, 443 P.2d 205 (1968) ; ORS 274.005(7), (8) (defining submerged and submersible lands). To complete the lexicon, this court's cases also use the more specific term "tidelands" to refer to the "land lying between ordinary high tide and ordinary low tide" of tidal waters and the term "upland" to refer to the property that lies above, but borders, the high-water mark of both tidal and nontidal bodies of water. Bowlby v. Shively , 22 Or. 410, 412, 30 P. 154 (1892), aff'd , 152 U.S. 1, 14 S. Ct. 548, 38 L. Ed. 331 (1894) (tideland definition); Smith Tug, 250 Or. at 614-15, 443 P.2d 205 (upland definition).
Our cases to date, however, have not addressed whether public ownership of the submerged and submersible land underlying publicly-owned waters includes any right of access to that water. Early public trust cases primarily explored limits on the state's ability to dispose of the tidelands (or "tide-lands") within its borders. See, e.g. , Hinman v. Warren , 6 Or. 408, 412 (1877) (explaining that the legislature had authorized the sale of tidelands but that the state had "no authority to dispose of its tide lands in such a manner as may interfere with the free and untrammeled navigation of its rivers, bays, inlets, and the like"); Bowlby, 22 Or. at 427, 30 P. 154 ("[O]ur courts have declared [the state's] absolute property in and dominion over the tide lands, and its right to dispose of its title in such manner as it might deem best, * * * subject only to the paramount right of navigation and the **440 uses of commerce."); Corvallis & Eastern R. Co. v. Benson, 61 Or. 359, 370, 121 P. 418 (1912) (although the legislature has authorized the state to dispose of its title to tidelands, it may not grant *14 away its rights in a way that "will materially interfere with navigation and commerce thereon").
Those cases are of limited relevance, for two main reasons. First, cases suggesting that the state has some ability to dispose of tidelands are of limited relevance because Oswego Lake is not affected by the tides. This court has described the state's ownership of lands that "are covered and uncovered by the tide" as of a different character than the state's ownership of other "lands lying under the navigable waters of the state." Winston Bros. , 156 Or. at 510, 62 P.2d 7. Although the state became "absolute owner" of the tidelands, with the right to dispose of those lands "subject only to the paramount right of navigation inherent in the public," the state's ownership rights with respect to lands covered by the nontidal navigable waters of the state are "merely those of a trustee for the public." Id. at 510-11, 62 P.2d 7. As a result, "[u]nlike tidelands, therefore, the state can make no sale or disposal of the soil underlying its navigable waters so as to prevent the use by the public of such waters for the purposes of navigation and fishing, but must hold them in trust for the public[.]" Id. at 511, 62 P.2d 7 ; see also Gatt v. Hurlburt, 131 Or. 554, 560-61, 284 P. 172 (1930) (similarly explaining distinction between state's absolute ownership of "lands lying between the ordinary high-water mark and the low-water mark of all navigable streams affected by the ebb and flow of the tide which are located within its borders" and state's ownership, "as trustee for the public, to all of the bed of navigable streams within its borders").
Second, and regardless of whether the state could dispose of the lands underlying Oswego Lake, the state has not disposed of its interest in those lands. Thus, if plaintiffs are able to establish that Oswego Lake is navigable under the federal test, then the lands underlying the lake remain owned by "the people in their united sovereignty" and held in trust for the public. Corvallis Sand & Gravel , 250 Or. at 334, 439 P.2d 575 (internal quotation marks omitted). We must determine the extent of the public's right to use the public water in the event of continuing public ownership of the underlying land.
**441 Defendants suggest that the most relevant guidance for answering that question comes from Morse v. Oregon Division of State Lands , 285 Or. 197, 202, 590 P.2d 709 (1979), in which this court quoted Bowlby 's statement about the state's right to dispose of tidelands. But Morse turns on a different principle and does not help us resolve the present case. In Morse , this court held that the public's trust interest in the tidal waters of Coos Bay did not prevent the Department of State Lands from allowing the city of North Bend to fill and use a part of the Coos Bay Estuary to build a new runway for the local airport. 285 Or. at 199-200, 590 P.2d 709. This court observed that the fill would not cause "substantial impairment of the public's interest" and emphasized that the Director of the Department of State Lands had found that the project served a public need that "outweigh[ed] the detriment to the use of the waters in question for navigation, fishing and recreational purposes[.]" Id. at 203, 207, 590 P.2d 709. Under the circumstances, this court explained, the public trust doctrine did not preclude the legislature from permitting the fill project.[16] Id. at 207, 590 P.2d 709. Thus, Morse demonstrates that the public trust doctrine does not absolutely preclude the state from interfering with the public's ownership interest in the navigable waters of the state, at least if the impairment is not "substantial" and serves a greater public need.
That conclusion is consistent with a principle explained in Illinois Central Railroad , which Morse described as "the bellwether" of public trust cases. Morse , 285 Or. at 201, 590 P.2d 709. The Supreme Court in Illinois Central Railroad explained that the state's control over lands underlying the waters of Lake Michigan, "for purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without *15 any substantial impairment of the public interest in the lands and waters remaining." 146 U.S. at 453, 13 S.Ct. 110. That principle, the Court explained, "follows necessarily from the public character of the property, being held by the whole people for purposes in which the whole people are interested." Id. at 456, 13 S. Ct. 110. Later in this opinion we will return to the limitations that the public trust doctrine places on the state's authority to **442 interfere with the public's right to use the publicly-owned waters of the state, but Morse offers no guidance on the threshold question at issue here-whether the public's right to use the publicly-owned waters includes a right to enter that water from public upland that abuts that water.
Plaintiffs argue that this court has already answered that question in a way that recognizes a public right to enter publicly-owned waters from abutting public land, relying on Darling v. Christensen , 166 Or. 17, 109 P.2d 585 (1941). Although we agree that Darling provides some guidance, plaintiffs read too much into that opinion. Darling resolved a quiet title action between the plaintiffs, who claimed title to land lying between the high- and low-water marks surrounding Siltcoos Lake, and the defendants, who owned waterfront lots that abutted the high-water border of the plaintiffs' "meander land."[17] We concluded that the owners of property abutting the high-water mark held a littoral "right of access to the water of this navigable body of water," and that the owner of the land below that high-water mark had "no right or authority to interfere with, interrupt or prevent the exercise of said right of access to said lake."[18] Id. at 31, 35, 109 P.2d 585.
In the course of reaching that conclusion, however, this court considered more broadly the "character" of the plaintiffs' title to the "meander land," including with respect to public streets that had their "termini" at the high-water border of the plaintiffs' land. Id. at 30-31, 109 P.2d 585. This court concluded that the streets would be deemed dedicated for use by the public and, therefore, "that such littoral rights to access to the lake by going upon and over the shore in front of the termini of said streets is in the public." Id. at 32, 109 P.2d 585. Plaintiffs seize on that statement and argue that they seek precisely the same right-access to the lake by going upon and over the shore of the abutting upland-at least with respect to the waterfront parks that are already designated for use by the public.
**443 Defendants question, however, whether that statement in Darling announced a right to access the lake under the "public trust" doctrine, and we agree that the discussion of the public's right of access to the lake appears to have been unnecessary to this court's resolution of the plaintiffs' claim that their littoral rights to access the water from their private property entitled them to an easement across the private land that separated their property from the open water. Neither the state nor the "public" generally were parties to that dispute, and no mention is made of the "public trust" doctrine. Rather, the court's statement about the public's right of access to the public water is based on its conclusion regarding the nature of rights possessed by the holder of littoral or riparian rights generally.
Nevertheless, the littoral or riparian rights of an owner of upland property to use the abutting water, as identified in Darling , bear some similarity to the rights that the owner of submerged and submersible lands has to use the water covering that land. We addressed those rights in the context of a private ownership interest in Eagle Cliff Fishing Co. v. McGowan , 70 Or. 1, 137 P. 766 (1914). The plaintiff in Eagle Cliff had leased land between the high- and low-water mark surrounding an island in the Columbia River.[19] When the defendant, another private *16 party, placed fishing buoys, ropes, and cables in the river in a way that interfered with the plaintiff's right of access to the river from the leased land, the plaintiff obtained an injunction to stop the defendant's interference. Id. at 5, 137 P. 766. This court affirmed the grant of an injunction to the plaintiff and explained that the plaintiff had a right of access "to and from" the river "[a]s an incident to the lawful occupation of lands, one border of which is the low-water line of the Columbia river[.] " Id. at 11, 137 P. 766.
Although Eagle Cliff discussed the rights of a private owner of submersible land, we described a similar right arising from public ownership of submerged and submersible lands, albeit in dicta , in Smith Tug , 250 Or. at 638, 443 P.2d 205. Smith Tug explained that the public retains "certain rights in the tidelands, the submersible lands, and the land below the **444 low-water mark[,]" even if the state has conveyed some ownership interest to private parties. Id . Because the dispute in Smith Tug involved the right of a private lessee of tidelands to use the water, it was "not necessary" for the court to "specifically define these public rights." Id. Nevertheless, this court emphasized that the "newest treatise on the subject of water rights" described those retained public rights as "the rights of the public to navigate, to fish, and to pass over the tidelands and submerged coastal lands[.]" Id. (quoting Clark (Editor-in-Chief), 1 Waters and Water Rights 247 (1967)).
Both Eagle Cliff and Smith Tug thus suggest that the rights flowing from ownership of submersible lands includes a right to pass from the upland border of that land to the adjacent water. That principle lends support to plaintiffs' proposal that public ownership of the submerged and submersible land underlying a navigable waterway provides a public right to enter that water from abutting upland that is designated for public use.
Plaintiffs also urge this court to follow the approach of courts in other states that have explicitly identified a right to access public water. For example, the Iowa Supreme Court has held that the public's right to use the water for purposes expressly protected under the public trust doctrine may "require means of public access" to that water. State v. Sorensen , 436 N.W. 2d 358, 363 (Iowa 1989). The court relied on that principle to hold that "state-owned land adjacent to the river, as well as the land actually covered by the river, must be part of the public trust" and, therefore, that a statute of limitations defense could not prevent the state from asserting its title to parcels of land created by accretion of the Missouri River. Id.
The Montana Supreme Court has endorsed a similar principle. Public Lands Access Ass'n v. Board of County Com'rs of Madison County , 373 Mont. 277, 321 P. 3d 38 (2014). The issue in that case was whether a private riparian landowner could prevent the public from using a public right-of-way along a bridge to gain access to the river below. The court first explained that, as a matter of state law, all waters in Montana were considered to be owned in trust for the public, whether or not navigable, with an attendant public right **445 to recreational use of the waters. Id. at 300-01, 321 P. 3d 38. Given that right, the court concluded both that the landowner could not prevent the public from entering the public water from the public right-of-way and that requiring that public access did not amount to an unconstitutional taking of riparian rights. Id. at 302, 321 P. 3d 38. As the court explained, nothing had been taken because the riparian landowner "never owned a property right that allowed him to exclude the public from using its water resource, including the riverbed and banks up to the high-water mark." Id .
New Jersey has taken a more expansive approach under its public trust doctrine, recognizing that the public's right of access to public ocean beaches can include a right to cross private uplands to reach the ocean. Matthews v. Bay Head Imp. Ass'n , 95 N.J. 306, 323-24, 471 A.2d 355 (1984). New Jersey's Supreme Court reasoned that, to say that the public had a right to swim in the ocean and use the beach "without assuring the public of a feasible access route would seriously impinge on, if not effectively eliminate, *17 the rights of the public trust doctrine." Id . at 323-24, 471 A.2d 355.[20]
We agree with the rationale that underlies the decisions in all three states: The public's ability to use the water for purposes expressly protected under the public trust doctrine may "require means of public access" to that water. See Sorensen , 436 N.W. 2d at 363. In the terminology of Morse and Illinois Central , interference with the public's access to public waterways can, itself, be a "substantial impairment" of the public's right to use the water for public trust purposes.
**446 Morse , 285 Or. at 203, 590 P.2d 709. We need not decide whether that right could extend as far as New Jersey has taken it, because plaintiffs seek only to enter public water from upland that is already open to the public.[21] We conclude that the rights incident to public ownership of the submerged and submersible lands beneath the navigable waters include a right of access to the public water from abutting public upland. As even plaintiffs recognize, however, the public's right to use publicly-owned bodies of water is not absolute.
We have held in the context of the public's right to fish that the state "in its sovereign capacity in trust for its people" may regulate and even prohibit the public's right to fish in navigable waters of state. Anthony et al. v. Veatch et al. , 189 Or. 462, 474, 220 P.2d 493 (1950) ; see also Morse , 285 Or. at 203, 590 P.2d 709 (concluding that publicly-owned nature of Coos Bay did not prohibit state action that impaired public's use of the bay to a limited extent and to accomplish a greater public benefit). Both holdings are consistent with a principle that we have described as a basic principle of trust law: "that a trustee has a duty to 'protect[ ] trust property' and to ensure, consistently with any requirements and prohibitions specific to the trust, that [trust property is] managed in a way that will benefit all trust beneficiaries." White v. Public Employees Retirement Board , 351 Or. 426, 450, 268 P.3d 600 (2011) (quoting Restatement (Third) of Trusts §§ 76, 79 (2003) (first brackets in original)).
Neither the legislature nor this court has mandated specific requirements or prohibitions to govern the state's management of the waters that it holds in trust for the public as a whole. Yet even when a trustee has discretion with respect to how trust property is managed, the trustee's actions must satisfy the "general standard of reasonableness" in exercising that discretion. Rowe v. Rowe et al. , 219 Or. 599, 604, 347 P.2d 968 (1959) ; see also White , 351 Or. at 442, 268 P.3d 600 (examining whether trustee's decision to settle claims was "reasonable"). As White explains, whether a trustee's action is reasonable is an "objective test of reasonableness in **447 the circumstances." 351 Or. at 443, 268 P.3d 600. We have also explained that the "bounds" of what is reasonable "will vary with the terms and purposes of the trust and the circumstances of each case." Rowe , 219 Or. at 604, 347 P.2d 968. Thus, we agree with plaintiffs' proposed rule that the rights incident to public ownership of the lands beneath navigable waters include a right of access to the public water from abutting public upland. And we conclude that rules interfering with the exercise of that *18 right must be objectively "reasonable" in light of the "purpose of the trust and the circumstances of each case." Id.
2. Whether "public trust" limitations apply to the city
According to plaintiffs, if the lake is publicly-owned, then the public trust doctrine limits the city's ability to interfere with the public's right of access to the lake, just as it limits the state's ability to interfere with that access. Defendants respond that the public trust doctrine should not limit the actions of a city because it is the state that has been assigned the role of trustee for the publicly-owned waters. The Court of Appeals agreed with defendants, explaining that "[p]laintiffs have not identified, nor are we aware of, any controlling authority for their proposition that, 'as a subdivision of the State [, the city] shares in public trust responsibilities' " and concluding that the "city is not an 'instrumentality' or agent of the state for that purpose." Kramer , 285 Or. App. at 209, 395 P.3d 592 (second bracket in original). The Court of Appeals, however, jumped to that conclusion without engaging in the analysis that we have prescribed for challenges to the validity of a city action.
Whether or not the city shares fully in the state's "public trust responsibilities," the city has affirmatively acted to prevent public access to the allegedly publicly-owned lake, and plaintiffs challenge those actions as invalid. Applying our analytical framework for evaluating such challenges to a city's actions, we conclude that the city lacks authority to take action that the state would be precluded from taking under the public trust doctrine.[22]
**448 In general, Oregon cities have " 'home rule' " authority " 'to regulate to the extent provided in their charters.' " State v. Uroza-Zuniga , 364 Or. 682, 686-87, 439 P.3d 973 (2019) (quoting Rogue Valley Sewer Services v. City of Phoenix , 357 Or. 437, 445, 353 P.3d 581 (2015) ). The so-called "home rule" provisions are found in Article IV, section 1(5), of the Oregon Constitution, which reserves initiative powers over local legislation, and in Article XI, section 2, which in part grants to "legal voters of every city and town" the "power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the State of Oregon[.]" Those provisions "provide authority for the people of a city to determine the organization, and to define the powers, of their local government without first having to obtain authorization from the state legislature." Springfield Utility Board. v. Emerald PUD, 339 Or. 631, 647, 125 P.3d 740 (2005) (citation omitted). "Under a city's home-rule authority, 'the validity of local action depends, first, on whether it is authorized by the local charter or by a statute[, and] second, on whether it contravenes state or federal law.' " Rogue Valley Sewer Services , 357 Or. at 450, 353 P.3d 581 (quoting La Grande/Astoria v. PERB , 281 Or. 137, 142, 576 P.2d 1204 (1978) (first brackets in Rogue Valley Sewer Services )). The first inquiry resolves this case.
Although the home rule provisions mean that the constitution directly grants to cities their authority to exercise a portion of state power, this court long ago explained that the enactment of the home-rule constitutional provisions has not changed the fundamental character of cities as "instrumentalities" or "agencies" of the State of Oregon. Klamath Falls v. Oregon Liquor Control Comm. , 146 Or. 83, 92-93, 29 P.2d 564 (1934) ; Kinney v. Astoria et al. , 108 Or. 514, 217 P. 840 (1923). Kinney emphasized that principle by repeating it in many formulations:
"Pure municipal corporations, such as cities, are merely instrumentalities of the state, established for the convenient administration of local government; they are state governmental agencies; they are auxiliaries of the state for the purpose of local self government; they are mere political subdivisions of the state created by authority of the state for the purpose of exercising a part of its powers[.]"
**449 Id. at 528, 217 P. 840. See also Klamath Falls , 146 Or. at 92, 29 P.2d 564 (emphasizing *19 that, "[u]nder our constitutional system of government, a municipality is an agency of the State"). Thus, limitations that the constitution sets on state authority also operate as limitations on cities, to which the constitution has assigned a portion of the authority of the state. See Ideal Tea Co. v. Salem , 77 Or. 182, 186-87, 150 P. 852 (1915) (explaining that Article I, section 20, "though evidently enacted to restrict the legislative assembly, also operates as a limitation upon the common council of a municipality"). Applying that principle in Ideal Tea Co. , this court declared that a city ordinance requiring only nonresident peddlers to obtain a license was "void" as contrary to Article I, section 20. Id . at 189, 150 P. 852.
That is consistent with the approach taken by the United States Supreme Court with respect to cities under the federal constitution. As that Court has explained, "fundamentally, a municipality is merely a political subdivision of the State from which its authority derives." United Building & Constr. Trades v. Mayor , 465 U.S. 208, 215, 104 S. Ct. 1020, 79 L. Ed. 2d 249 (1984) (citing Trenton v. New Jersey, 262 U.S. 182, 187, 43 S. Ct. 534, 67 L. Ed. 937 (1923) ). Thus, "what would be unconstitutional if done directly by the State can no more readily be accomplished by a city deriving its authority from the State." United Building , 465 U.S. at 215, 104 S.Ct. 1020 ; see also Avery v. Midland County , 390 U.S. 474, 480, 88 S. Ct. 1114, 20 L. Ed. 2d 45 (1968) ("The actions of local government are the actions of the State. A city, town, or county may no more deny the equal protection of the laws than it may abridge freedom of speech, establish an official religion, arrest without probable cause, or deny due process of law." (Emphasis in original.)).
Just as the state and federal constitutions limit the state's authority to interfere with certain protected conduct, Oregon's public trust doctrine limits the state's authority to interfere with the public's right to use the public waters of the state. Specifically, we have concluded that the doctrine limits the state's authority to interfere with the public's right to enter the publicly-owned waters from abutting upland that is open to the public. Restrictions on that right must be objectively reasonable in light of the purpose of **450 the trust and the circumstances of the case. Because the state's authority to enact restrictions on the public's access to publicly-owned waters is limited in that way, the same limitations apply to the authority of a city, to which the constitution has assigned a portion of the authority of the state.
3. Application to this case
Our conclusion that the city may not unreasonably interfere with the public's ability to enter the public water from abutting upland that is open to the public has two consequences for plaintiffs' claim under the public trust doctrine. First, the rule does not implicate the residents-only swim park policy because that policy denies public entry to the upland in the first place, not entry into the water from upland that is open to the public. Second, our conclusion means that the validity of the waterfront resolution depends upon whether the restriction on the public's right to enter the water from that public upland is objectively reasonable under the circumstances. That question can only be answered after genuine issues of material fact are resolved on remand. The list of pertinent material facts, of course, begins with whether the city is correct that the lake is not among those navigable waters for which the state holds title to the underlying land. If the city's premise is incorrect, then additional relevant circumstances include the extent to which the denial of water access from the waterfront parks impairs the public's ability to use the public water and whether the prohibition reasonably furthers the purpose of the trust in other ways. On this record, the trial court erred in concluding that defendants are entitled to summary judgment on plaintiffs' second claim for relief.
D. Plaintiffs' Challenge Under Article I, section 20 .
Plaintiffs' third claim for relief seeks a declaration that both the waterfront resolution and the swim park policy unequally distribute the privilege of lake access according to classifications based on residency, in violation of Article I, section 20. That Oregon *20 constitutional provision specifies that "[n]o law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens." **451 Or. Const., Art. I, § 20. With respect to the waterfront resolutions, plaintiffs contend that the prohibition on entering the water unconstitutionally creates a monopoly on lake use for the class of citizens who are shareholders of Lake Oswego Corporation. With respect to the swim park policy, plaintiffs contend that the city has unlawfully granted the privilege of use only to a class of citizens who are city residents. On this record, we are not persuaded that either the waterfront resolution or the swim park policy violates Article I, section 20.
1. Whether the waterfront resolution violates Article I, section 20 .
Plaintiffs' challenge to the waterfront resolution fails because it is not the kind of law that triggers scrutiny under Article I, section 20. As explained at the outset of this opinion, that resolution prohibits "any person to enter Oswego Lake from Millennium Plaza Park, Sundeleaf Plaza or Headlee Walkway by any means or method, including, without limitation, by wading or swimming, or by using water vessels or other floatation devices." (Emphasis added.) Thus, the text of the resolution applies "upon the same terms" to all people.
Despite that facial neutrality, plaintiffs argue that the resolution violates Article I, section 20, because it has a "practical exclusionary effect." Plaintiffs emphasize that, apart from the downtown parks, access to the land abutting Oswego Lake is monopolized by the class of private land owners who are shareholders in Lake Oswego Corporation. For individuals who are not members of that privileged class, the shoreline of the downtown parks is the only potential entry point into water that-we are asked to assume-all Oregonians have a right to use. Under those circumstances, plaintiffs argue, the resolution violates Article I, section 20, by permitting members of a privileged class to monopolize "the commonly held resource." Plaintiffs insist that this court has invalidated other similar laws under Article I, section 20, when "the side-effect of a seemingly non-discriminatory enactment is to create an impermissible privileged class." But plaintiffs' understanding of our case law is not correct.
**452 Article I, section 20, addresses government grants of a privilege or immunity in an unequal manner. As we explained in greater detail in State v. Savastano , 354 Or. 64, 75, 309 P.3d 1083 (2013), "[i]n the period leading up to the Civil War, the phrase 'privileges and immunities' ordinarily referred to state created rights." (citing Kurt T. Lash, The Origins of the Privileges or Immunities Clause, Part I: "Privileges and Immunities" as an Antebellum Term of Art, 98 Geo. L.J. 1241, 1253, 1260-61 (2010) ). As with other privileges and immunities clauses drafted in that era, the purpose of Article I, section 20, was "to prevent the government from granting benefits only to a favored few." Id. (citation omitted).
The privilege that plaintiffs seek at the waterfront parks is the privilege of entering the water from the shoreline of the waterfront property to engage in recreational activities like boating or paddle boarding on the lake. But that is not a privilege that the city has granted to anyone. Although shareholders of Lake Oswego Corporation have the ability to enter the water from private property elsewhere along the lakeshore, that privilege is a product of private property rights. It is not a government-granted privilege, so it does not implicate Article I, section 20.
The cases on which plaintiffs rely do not suggest a different approach. Rather, they reflect the same constitutional concern with preventing the government from unequally granting state-created privileges or immunities. See Zockert v. Fanning , 310 Or. 514, 800 P.2d 773 (1990) ( Article I, section 20, prevented state from providing indigent parents with counsel for termination of parental rights under one statute but not under a different statute); M. & M. Co. v. State Ind. Acc. Com. , 176 Or. 35, 155 P.2d 933 (1945) (with respect to fees charged to employers engaged in hazardous occupations to fund employer safety programs, legislature had no reasonable basis for allowing employers who participated in workers compensation coverage *21 a reduced payment compared to those who elected not to participate). The city's waterfront resolution does not grant anyone a privilege to enter the lake-unequally or otherwise-and, thus does not implicate Article I, section 20. **453 2. Whether the swim park policy violates Article I, section 20 .
Plaintiffs' challenge to the swim park policy rests on stronger footing. We have emphasized that "every law itself can be said to 'classify' what it covers from what it excludes[,]" but that Article I, section 20, is addressed to "a law's disparate treatment of persons or groups by virtue of characteristics which they have apart from the law in question." State v. Clark , 291 Or. 231, 240, 630 P.2d 810 (1981).[23] Defendants do not dispute that the city permits use of the swim park only to the class consisting of city residents.[24] Thus, we also accept plaintiffs' proposition that using the swim park is a privilege for purposes of Article I, section 20. See, e.g. , City of Salem v. Bruner , 299 Or. 262, 268-69, 702 P.2d 70 (1985) (explaining that Article I, section 20, applies "[w]henever a person is denied some advantage to which he or she would be entitled but for a choice made by a government authority"). The question is whether Article I, section 20, prevents the city from granting that privilege only to those who share the characteristic of residing in the city.
As an initial matter, we emphasize what is clear from the text of the provision and from our cases construing it: Article I, section 20, does not prohibit all differentiation in the granting of privileges and immunities. It prohibits only the granting of privileges or immunities that are not "equally" available "upon the same terms." See Savastano , 354 Or. at 73, 309 P.3d 1083 (explaining that this court has recognized that Article I, section 20, "permits the legislature to grant privileges or immunities to one citizen or class of citizens as long as similarly situated people are treated the same" (citation omitted)). As the words of the provision suggest, whether a statute violates Article I, section 20, may depend upon which "terms" are constitutionally significant. For example, in the earliest decision addressing Article I, section 20, this court rejected a challenge to a statute that granted those working **454 as sailors an immunity from arrest and imprisonment for a debt, reasoning that the immunity belonged equally to all who satisfied the terms "debtors and sailors," even though the immunity was not equally available to those who were only "debtors." In re Oberg , 21 Or. 406, 28 P. 130 (1891) ; see also Clark , 291 Or. at 240 n. 11, 630 P.2d 810 (observing that a "principle that like shall be treated alike, cannot rise beyond tautology without deciding what is alike for constitutional purposes"). The question here is whether a difference in city of residence is a term on which Article I, section 20, permits the city to differentiate in its grant of the privilege of using the swim park. The parties have very different views of how this court should decide that question.
Defendants point to the small size of the swim park and the cost required to operate it safely and argue that the city is constitutionally permitted to limit the privilege of park use to residents to "ensure[ ] that those who pay for the park through their local taxes and fees actually get to use the park[.]" The Court of Appeals held that the city "reasonably could decide to limit the swim park's use" to address those concerns. Kramer , 285 Or. App. at 215, 395 P.3d 592. The court, thus, concluded that the classification is "rational" and does not violate Article I, section 20. Id .
Plaintiffs argue, however, that the Court of Appeals gave too much deference to the city's justification for the policy. According to plaintiffs, this court's cases require "heightened scrutiny" of a local government enactment that creates a monopoly, particularly a monopoly on "commonly held natural resources, *22 " which plaintiffs contend is the effect of the swim park policy. Alternatively, plaintiffs argue that the policy is not even "rational" because the city could have addressed its concerns by simply charging a user fee to nonresidents.
We begin with plaintiffs' contention that this court employs a qualitatively different analysis-a "heightened scrutiny"-when reviewing grants of a local monopoly or monopoly on a natural resource, and we ultimately reject that view of our case law. We pause to emphasize, however, that plaintiffs' term "heightened scrutiny" invokes the three-tiered framework that the United States Supreme **455 Court employs under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. That framework uses the term "heightened scrutiny" to describe how the Court reviews classifications that it considers to warrant an "intermediate" level of scrutiny, such as a law that discriminates on the basis of gender. See Hewitt v. SAIF , 294 Or. 33, 40, 653 P.2d 970 (1982) (quoting Wengler v. Druggists Mutual Ins. Co., 446 U.S. 142, 152, 100 S. Ct. 1540, 64 L. Ed. 2d 107 (1980) ). This court has not adopted the Supreme Court's three-tiered framework for evaluating challenges under Article I, section 20.
We most clearly announced our independent analytical path in Hewitt , in which we declined to adopt the Supreme Court's standard for analyzing Equal Protection challenges to laws that differentiate on the basis of gender. 294 Or. at 41, 653 P.2d 970. As we emphasized, "[t]here is no requirement" that the "court adopt a fourteenth amendment standard for the application of [A]rticle I, section 20," and "[i]t is our duty to determine what the standard should be under our own constitution for statutes that classify on the basis of gender." Id. More recently in Savastano , we dismissed an older Article I, section 20, decision as of limited precedential value because "it undertook no independent analysis of Article I, section 20." 354 Or. at 81, 309 P.3d 1083.[25]
That independent analysis in Hewitt led this court to depart from the Equal Protection test for laws that discriminate on the basis of gender and to hold that a classification based on gender is "like racial, alienage and nationality classifications" because it "focuses on 'immutable' personal characteristics" and "can be suspected of reflecting **456 'invidious' social or political premises, that is to say, prejudice or stereotyped prejudgments." 294 Or. at 45-46, 653 P.2d 970 (footnote omitted). Although that suspicion can be overcome, a classification drawn on the basis of stereotype, "and for no other reason," will not withstand a challenge under Article I, section 20. Id. at 46-47, 653 P.2d 970.
Apart from classifications based on the "immutable" personal characteristics discussed in Hewitt , however, this court has not described differentiation in the granting of privileges or immunities as "suspect." Instead, we have used various formulations over the years to explain the test for whether a distinction based on characteristics that are not "immutable" violates Article I, section 20, all of which amount to the test by which the Court of Appeals evaluated the swim park distinction at issue here. For much of the twentieth century, this court tended to ask whether there was a "reasonable basis" for the legislation, a question that included whether the legislation was enacted for a legitimate purpose. See, e.g. , State v. Wright , 53 Or. 344, 349, 100 P. 296 (1909) (a state "may impose a tax on, or require a license from, persons engaged in certain callings or trades, * * * [b]ut the classification must be on some reasonable basis");
*23 State v. Nicholls , 77 Or. 415, 418, 151 P. 473 (1915) ("the legislation must have some reasonable relation to those elements of public concern"); Huckaba v. Johnson , 281 Or. 23, 31, 573 P.2d 305 (1978) (treating military pensioners differently for income deduction was "reasonably related to the legislative objective of extending the tax benefit on an approximately equal basis to federal retirees").[26]
Later, this court began asking whether the distinction between classes was "rational," and eventually that term came to be our consistent formulation of the test. See, e.g. , Seto v. Tri-County Metro. Transportation , 311 Or. 456, 467, 814 P.2d 1060 (1991) (geographic classification in public **457 works legislation "tested by whether the legislature had authority to act and whether the classification has a rational basis"). However, the cases contain no suggestion that the change in formulation from "reasonable" to "rational" represented a substantive change in the constitutional test. In fact, our most recent formulations of the Article I, section 20, test have incorporated both terms. See Knapp v. City of Jacksonville , 342 Or. 268, 276, 151 P.3d 143 (2007) (explaining that a "classification is rationally based if it rests upon genuine differences and those differences bear a reasonable relationship to the legislative purpose" (internal quotation marks omitted)); Savastano , 354 Or. at 96, 309 P.3d 1083 (explaining that an official's denial of a privilege granted to other citizens "will be defensible [under Article I, section 20 ] when there is a rational explanation for the differential treatment that is reasonably related to the official's task or to the person's individual situation" (internal quotation marks omitted)).
Thus, it appears that in evaluating whether the city permissibly grants the privilege of swim park entry only to city residents, the Court of Appeals correctly focused on whether the city "reasonably" could decide to exclude nonresidents from the park as a way of ensuring that the facility was available to residents. Nevertheless, plaintiffs argue that the nature of the privilege that the city has granted is so important that any differentiation must be justified by more than a rational basis. Plaintiffs contend that under this court's cases, "[t]here is no basis for deferential review when a local government's enactment creates a monopoly for local citizens[.]" (Emphasis in original.) Plaintiffs also contend that our cases have applied a qualitatively different test-a "virtually per se" prohibition-on laws that create a monopoly on "commonly held natural resources," and they argue that the swim park policy similarly should be prohibited.
Plaintiffs are correct that grants of monopolies are a matter that is of particular concern in our Article I, section 20, cases. See Clark , 291 Or. at 236, 630 P.2d 810 (describing the "original concern" of the provision as "with special privileges or 'monopolies' "). But plaintiffs are not correct that this court has employed a qualitatively different standard for **458 evaluating classifications that involve monopolies. Rather, in the cases on which plaintiffs rely, the court at least implicitly concluded that the challenged classification was unreasonable. See Mendiola v. Graham , 139 Or. 592, 611, 10 P.2d 911 (1932) (invalidating a statute that permitted local residents of grazing districts to limit grazing permits because-after court struck one portion of statute as contrary to federal law-the remaining classification was not "a practicable or reasonable measure" for protecting the ability of local residents to obtain grazing permits (emphasis added)); Ideal Tea , 77 Or. at 188-89, 150 P. 852 (explaining that "classification must be on some reasonable basis ," and concluding city ordinance imposing a fee on "peddlers" who did not have a place of business in the city violated Article I, section 20, because "the business in which the plaintiffs are engaged is identical with that of" others who were not taxed (emphasis added, *24 internal quotations omitted)); Aluminum Utensil Co. et al. v. North Bend et. al , 210 Or. 412, 428, 311 P.2d 464 (1957) (relying on Ideal Tea and concluding that ordinance imposing fee only on solicitors who were not associated with a local merchant was based on a classification that "is less substantial than that which was required by [the ordinance] in the Ideal Tea case"); State v. Savage , 96 Or. 53, 58, 60, 184 P. 567 (1919) (invalidating statute that exempted canneries from limits on crab harvesting after explaining that there must be "some reasonable ground of distinction sufficient to show that the classification is not merely personal and arbitrary").
We acknowledge that one early case could appear to support plaintiffs' proposed rule of a "virtually per se " prohibition on laws that grant monopolies to "commonly held natural resources." In Hume v. Rogue River Packing, Co ., 51 Or. 237, 258-59, 92 P. 1065 (1907), this court declined to construe a statute as granting the plaintiff the exclusive right to fish for salmon in a section of the Rogue River because granting that monopoly on the "business of fishing" would violate Article I, section 20. Id . at 261, 92 P. 1065. However, we have explained Hume as concluding that there was no "legitimate basis for giving only one person a right that the people held in common." Savastano , 354 Or. at 79, 309 P.3d 1083 (emphasis added). That explanation aligns the conclusion in Hume with the test applied in this court's other Article I, section 20, cases: there **459 must be a reasonable relationship between the classification and the legitimate legislative purpose that it serves. See, e.g. , Anthony , 189 Or. at 474, 491, 493, 220 P.2d 493 (upholding law that prohibited "fixed gear in fishing for salmon in the Columbia River" because state has "right *** to regulate and even to prohibit the capture of fish in navigable waters within its borders" and the "facts tend to show that there is a reasonable basis for discrimination against fixed-gear fishing"); see also School District No. 12 v. Wasco County , 270 Or. 622, 629, 529 P.2d 386 (1974) (explaining that court asks whether "the classifications created bear some rational relationship to a legitimate state interest").
Thus, the Court of Appeals correctly asked whether the city's swim park exclusion is "rational." As we have explained, the question of whether the differential treatment is rational depends on whether the classification reflects a "genuine difference" that bears a "reasonable relationship" to the legitimate legislative purpose. Knapp , 342 Or. at 276, 151 P.3d 143 (quotation marks omitted). In addition, as Hume and the other early cases illustrate, the nature of a privilege or immunity bears some relation to whether it is reasonable (or rational) for the legislature to selectively grant the privilege to only some classes. For example, this court's conclusion in Hume that the legislature had no legitimate basis for creating a monopoly on the "business of fishing" turned on this court's assessment of the significance of that "right of citizenship and property combined" to those who would no longer be able to exercise it. 51 Or. at 259, 92 P. 1065. Other cases, similarly, have taken into account the nature of the privilege or immunity as part of the inquiry into whether a classification survived challenge under Article I, section 20. See Ladd v. Holmes, 40 Or. 167, 182, 66 P. 714 (1901) (before concluding that a restriction on how minor parties could select candidates was "reasonably suited" to the state purpose of supervising primary elections, emphasizing "[t]here is no discrimination against the minor parties, except in the mode of certifying their nominations, as they may yet hold primaries and conventions"); Sandys v. Williams , 46 Or. 327, 342, 80 P. 642 (1905) (before concluding that privilege of selling liquor in private rooms could be granted to hotels but denied to taverns, emphasizing that "no person possesses **460 an inherent right to engage in any employment, the pursuit of which is necessarily detrimental to the public" (internal quotation marks omitted)); Kliks et al. v. Dalles City et al. , 216 Or. 160, 178-79, 183, 335 P.2d 366 (1959) (holding that differences between hotels and apartment houses did not provide a reasonable basis for unequally granting the privilege of more favorable water usage rates but emphasizing that the differences might provide "a valid basis for classifying the two differently" if the privilege had involved tax rates). *25 Here, defendants contend, and the Court of Appeals agreed, that the residents-only restriction bears a reasonable relationship to the city's purpose of managing the swim park in a way that ensures that the recreational facility is available for use by city residents. We agree as well. Because it is plaintiffs who contend that the policy is invalid under Article I, section 20, it is plaintiffs who are required "to establish that the city had no rational basis for creating the class of persons" to whom the privilege is granted. Knapp , 342 Or. at 276, 151 P.3d 143. However, because defendants prevailed on their motions for summary judgment, we view the evidence and all reasonable inferences that may be drawn from the evidence in the light most favorable to plaintiff, the nonmoving party. TriMet v. Amalgamated Transit Union Local 757 , 362 Or. 484, 491, 412 P.3d 162 (2018).
We begin by considering the nature of the challenged action. The city has granted only to city residents the privilege to enter the city swim park. There are no genuine issues of material fact regarding the nature of that privilege. The swim park occupies two of the parcels originally platted by Oregon Iron & Steel. The side of the park that abuts the lake is bordered by a three-sided, fenced dock, which creates a small, enclosed swimming area. According to plaintiff Prager, the swimming area is "smaller than an Olympic-size swimming pool." The park, which is open only during July and August, features diving platforms, water sprayers, inner tube games, outdoor showers and lounge chairs. Entrance to the park is free and provides access to the enclosed swimming area, which is monitored by certified lifeguards. The city's rules do not permit anyone to fish or **461 boat on the enclosed water of the swim area, and there is no evidence that the park affords access to the open waters of the lake. In other words, whether or not the lake as a whole is a common public resource, there is no evidence that the privilege of entering the swim park is more than the privilege to use a city-created recreational facility.[27] And there is no dispute that managing a city recreational facility for the benefit of city residents is a legitimate exercise of city authority.
The next question is whether the entrance restriction bears a reasonable relationship to the city's purpose in managing the city facility. On that point, the record contains undisputed evidence that there are costs to the city associated with managing the swim park, such as employing lifeguards. Nor is there any dispute that the number of people who can safely use the park is limited by its size. Limiting use of that facility to city residents is one way to address the city's management concerns about size and cost.
Plaintiffs' only argument for why we should reject the Court of Appeals' conclusion that the residents-only restriction bears a reasonable relationship to the identified purpose is to point out that a "user fee" also would address the city's fiscal concerns. That argument misapprehends the nature of the court's inquiry. As we have explained, if a classification bears "some rational relationship to a legitimate state interest[,]" then it is "immaterial that available alternatives may be better suited to carry out the rationale[.]" School District No. 12 , 270 Or. at 629, 529 P.2d 386. Under the circumstances, we agree with the Court of Appeals that the restriction does not violate Article I, section 20.
III. CONCLUSION
We conclude that the public's interest in the navigable waterways that are held in trust by the state includes a right of access to the publicly-owned water from abutting public land and that state interference with the public's exercise of that right must be objectively "reasonable" in **462 light of the purpose of the trust and the circumstances of each case. We also conclude that cities are subject to the same limitations on their authority to restrict the public's right of access to publicly-owned water. Finally, assuming that Oswego Lake is a navigable waterway held in trust by the state, we conclude that genuine issues of material fact preclude a determination that the waterfront resolution *26 is a "reasonable" restriction on the public's right of access. Thus, the trial court erred in granting summary judgment to defendants on plaintiffs' claim for a declaration that the waterfront resolution exceeds the city's authority as limited by the public trust doctrine. The trial court did not err in granting summary judgment on plaintiffs' remaining claims for relief.
Accordingly, the decision of the Court of Appeals is reversed in part and affirmed in part. The judgment of the trial court is remanded for a declaratory judgment in favor of defendants on plaintiffs' first and third claims for relief, and the judgment is reversed and remanded for further proceedings to resolve part of plaintiffs' second claim for relief (which seeks a declaration that the waterfront resolution exceeds the city's authority as limited by the public trust doctrine).

In general, the term "riparian rights" refers to rights associated with land adjacent to navigable bodies of water, including the right of access to the water from the land. Darling v. Christensen , 166 Or. 17, 34, 109 P.2d 585 (1941). We suggested in Darling that the term "littoral rights" may be more technically accurate when the body of water is a lake, rather than a river, id. at 34-35, 109 P.2d 585, but the relevant deeds describe Lake Oswego Corporation's interest as "riparian rights," so we do as well.

There is another small swim park on the lake that is seasonally open only to individuals residing within the boundaries of the former Lake Grove School District. That park is not owned by the city and is not at issue in this case.

The Court of Appeals also concluded that the trial court erred in dismissing the case rather than entering a declaration as to the parties' rights and, for that reason, vacated and remanded for the court to enter a declaratory judgment. Kramer , 285 Or. App. at 183-84, 395 P.3d 592. Plaintiffs do not dispute that, if the trial court correctly ruled on the merits of all the summary judgment motions, then the remand for entry of a declaratory judgment is correct.

Although plaintiffs ask this court to resolve the lake's public status in their favor on the undisputed facts, plaintiffs did not seek summary judgment on that basis. Accordingly, we decline to address that question for the first time on review.

The Act of Feb. 14, 1859, admitting Oregon into the Union, provided in part that: "All the navigable waters of said State, shall be common highways and forever free, as well as to the inhabitants of said State as to all other citizens of the United States, without any tax, duty, impost, or toll therefor." Act of Feb. 14, 1859, ch. 33, § 2, 11 Stat. 383.

Ancient origins of the doctrine can be found in the more comprehensive Roman law promulgated by Emperor Justinian, which provided:
"1. Thus, the following things are by natural law common to all-the air, running water, the sea, and consequently the sea-shore. No one therefore is forbidden access to the seashore, provided he abstains from injury to houses, monuments, and buildings generally; for these are not, like the sea itself, subject to the law of nations.
"2. On the other hand, all rivers and harbours are public, so that all persons have a right to fish therein.
"3. The sea-shore extends to the limit of the highest tide in time of storm or winter.
"4. Again, the public use of the banks of a river, as of the river itself, is part of the law of nations; consequently every one is entitled to bring his vessel to the bank, and fasten cables to the trees growing there, and use it as a resting-place for the cargo, as freely as he may navigate the river itself. But the ownership of the bank is in the owner of the adjoining land, and consequently so too is the ownership of the trees which grow upon it.
"5. Again, the public use of the sea-shore, as of the sea itself, is part of the law of nations; consequently every one is free to build a cottage upon it for purposes of retreat, as well as to dry his nets and haul them up from the sea. But they cannot be said to belong to any one as private property, but rather are subject to the same law as the sea itself, with the soil or sand which lies beneath it."
The Institutes of Justinian , Book II, Title I, translated into English by J.B. Moyle, 5th ed. (1913).

The term "equal footing" captures only a piece of the legal theory under which the State of Oregon claims title to the beds of navigable water. For most purposes, this opinion will use the more descriptive term "state ownership."

For the purposes of determining state title under federal law, a body of water is considered navigable if, at the time of statehood, in its natural and ordinary condition, the body of water was "used, or [was] susceptible of being used *** as [a] highway[ ] for commerce, over which trade and travel [were] or [could have been] conducted in the customary modes of trade and travel on water." PPL Montana , 565 U.S. at 592, 132 S.Ct. 1215 (internal quotation marks and citations omitted); see also United States v. Utah, 283 U.S. 64, 51 S. Ct. 438, 75 L. Ed. 844 (1931) (applying navigability test for purposes of determining state title under "equal footing" doctrine).

This court emphasized in Guilliams that many lakes of the state are not suitable for commercial navigation but
"are used-and as population increases, and towns and cities are built up in their vicinity, will be still more used-by the people for sailing, rowing, fishing, fowling, bathing, skating, taking water for domestic, agricultural, and even city purposes, cutting ice, and other public purposes which cannot now be enumerated or even anticipated. To hand over all these lakes to private ownership, under any old or narrow test of navigability, would be a great wrong upon the public for all time, the extent of which cannot, perhaps, be now even anticipated."
90 Or. at 29, 175 P. 437.

Plaintiffs argue that they were entitled to a partial declaration that the public has a right to use the lake, regardless of whether they can prevail on their first claim for relief. The Court of Appeals expressed skepticism that plaintiffs' trial court pleadings presented that issue but also concluded that the trial court was not required to grant a partial declaration under the circumstances of this case. Kramer , 285 Or. App. at 192, 395 P.3d 592 ; id . at 196, 395 P.3d 592. We decline to address that ruling.

For convenience, we refer to those navigable bodies of water that are subject to the public trust doctrine as "publicly-owned water," although technically the state holds title to the land underlying the water.

Water is not the only resources that the state holds in trust. See State v. Dickerson , 356 Or. 822, 834-35, 345 P.3d 447 (2015) (explaining that "Oregon courts have long used the metaphor of a trust to describe the state's interest in wildlife" and that the state holds wildlife in trust for the benefit of the public); Portland Fish Co. v. Benson , 56 Or. 147, 154, 108 P. 122 (1910) (emphasizing that "title to the fish, before they are captured, is in the state in its sovereign capacity, in trust for all its citizens").

Although the nature of the trust is a matter of state law, Illinois Central Railroad suggests that some fundamental principles may set a floor for the state's management of public trust waters. 146 U.S. at 453, 13 S.Ct. 110 ("The State can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them, so as to leave them entirely under the use and control of private parties, *** than it can abdicate its police powers in the administration of government and the preservation of the peace."). See Idaho v. Coeur d'Alene Tribe of Idaho , 521 U.S. 261, 285, 117 S. Ct. 2028, 138 L. Ed. 2d 438 (1997) ("While Illinois Central was necessarily a statement of Illinois law, it invoked the principle in American law recognizing the weighty public interests in submerged lands." (Internal quotation marks and citations omitted.)).

ORS 274.025(1) provides:
"The title to the submersible and submerged lands of all navigable streams and lakes in this state now existing or which may have been in existence in 1859 when the state was admitted to the Union, or at any time since admission, and which has not become vested in any person, is vested in the State of Oregon. The State of Oregon is the owner of the submersible and submerged lands of such streams and lakes, and may use and dispose of the same as provided by law."

ORS 274.430(1) provides:
"All meandered lakes are declared to be navigable and public waters. The waters thereof are declared to be of public character. The title to the submersible and submerged lands of such meandered lakes, which are not included in the valid terms of a grant or conveyance from the State of Oregon, is vested in the State of Oregon."
ORS 274.430(3) specifies, however, that the state ownership of the "submersible and submerged lands" does not impair "the title of any upland or riparian owner."

Morse is the first case in which this court described the law governing the publicly-owned waters as the "public trust doctrine."

Darling refers to that land between the high- and low-water marks surrounding the lake as "meander land," 166 Or. at 20, 109 P.2d 585, but the described land also fits the definition of "submersible land." Smith Tug , 250 Or. at 615, 443 P.2d 205 ; ORS 274.005(8).

Darling explains that the term "littoral rights" is equivalent to "riparian rights" but is the more technically accurate term when referring to the rights of landowners abutting a lake. 166 Or. at 34-35, 109 P.2d 585.

The decision explains that the state had granted these "tidelands" to the United States, which had leased them to the plaintiff. Eagle Cliff , 70 Or. at 3, 137 P. 766.

Other states have rejected the New Jersey approach with respect to private lands but have not considered the question of access rights from public land. See Idaho Code Ann. § 36-1601 (public has right to use "navigable stream," but that right of use does not "authorize the entering on or crossing over private land"); Montana Constitution, Art IX, § 7 ("The opportunity to harvest wild fish and wild game animals is a heritage that shall forever be preserved to the individual citizens of the state and does not create a right to trespass on private property[.]"); State v. McIlroy , 268 Ark. 227, 238, 595 S.W.2d 659 (1980) ("It is not disputed that riparian landowners on a navigable stream have a right to prohibit the public from crossing their property to reach such a stream."); Sheftel v. Lebel , 44 Mass. App. Ct. 175, 183, 689 N.E. 2d 500 (1998) ("The public has, however, no right of perpendicular access across private upland property, i.e. , no right to cross, without permission, the dry land of another for the purpose of gaining access to the water or the flats in order to exercise public trust rights; doing so constitutes a trespass.").

Although plaintiff Kramer seeks a right to enter the swim park to reach the water, the only evidence is that the swim park provides no point of access to the water for the activity in which Kramer alleges an interest-canoeing on the lake.

We need not decide whether the city shares fully in the state's duties as trustee for the publicly-owned waterways. For purposes of the declarations that plaintiffs seek, it is enough to conclude that any limitations on the state's ability to interfere with the public's right to use the public trust waters are, similarly, limits on the city's authority.

An example of a class that we have said does not exist independently of the statutes relating to that class is the class consisting of persons who do not have commercial driver's licenses. State v. Orueta , 343 Or. 118, 127, 164 P.3d 267 (2007).

It does not appear that any city ordinance specifies the restriction, but a sign posted on the external fence specifies "Lake Oswego Residents Only."

There is no reason that the analytical framework for Article I, section 20, would track the analytical framework for the Equal Protection Clause. As we have explained, the "Reconstruction Congress, which adopted the fourteenth amendment in 1868, was concerned with discrimination against disfavored groups or individuals, specifically, former slaves. When [A]rticle I, section 20, was adopted as a part of the Oregon Constitution nine years earlier, in 1859, the concern of its drafters was with favoritism and the granting of special privileges for a select few." Hewitt , 294 Or. at 42, 653 P.2d 970 (citations omitted). However, we have emphasized that there is significant overlap between whether a statute complies with Article I, section 20, and whether it complies with the Equal Protection Clause of the Fourteenth Amendment. Id. at 43, 653 P.2d 970 (citing decisions in which this court noted that compliance with Article I, section 20, will correspond to compliance with the equal protection clause").

This court's early decisions sometimes used alternative terms that it seemingly equated to "reasonableness." See, e.g. , City of Klamath Falls v. Winters , 289 Or. 757, 776-77, 619 P.2d 217 (1980) (asking whether distinction was "arbitrary" but suggesting the answer equated to whether the distinction was "unreasonable"); Savage v. Martin , 161 Or. 660, 91 P.2d 273 (1939) (same); M. & M. Co. , 176 Or. at 44, 155 P.2d 933 (seemingly equating "reasonable ground for classifications" with one bearing "a just and proper relation to the purposes of the law and to the classifications" (citations omitted)).

By contrast, as plaintiffs averred in the trial court, the city also operates a number of parks along the Willamette River that provide access to the open waters of the river, and the city does not limit the use of those parks to city residents.